**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

Ventrassist Pty Ltd. and University of
Technology at Sydney,

         Plaintiffs,             Case No. 04-61703-CIV-MARRA

      v.

HeartWare, Inc.,

         Defendant.

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION**
**TO DISMISS PLAINTIFFS' COMPLAINT PURSUANT TO FRCP 12(b)(1) AND**
**12(b)(6) OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT PURSUANT TO**
**FRCP 12(b) AND 56**

## I. INTRODUCTION

Defendant HeartWare, Inc. ("HeartWare") has moved to dismiss the Complaint[1] filed by

Ventrassist Pty. Ltd.[2] and University of Technology at Sydney ("the Plaintiffs") for lack of

subject matter jurisdiction and for failure of Plaintiffs to state a claim under Fed. R. Civ. P.

12(b)(1) and 12(b)(6), because all of HeartWare's activities are exempt from infringement

pursuant to the safe harbor provision of 35 U.S.C. § 271(e)(1). Plaintiffs have disregarded

HeartWare's Section 271(e)(1) exemption and have improperly brought this suit (a) to force

HeartWare to negotiate a patent cross-license and (b) to interfere with HeartWare's initial public

**NON-COMPLIANCE OF S.D. fla. L.R.** *5c(A.)* *5.1A.5*

---

[1] A copy of the Complaint is attached as Exhibit 1.

[2] Ventrassist Pty Ltd. is a subsidiary of Ventracor Limited.



offering (IPO) to raise capital in Australia.[3]

Included with this memorandum are declarations from former officials of the U.S. Food and Drug Administration (FDA) demonstrating that HeartWare's activities regarding its implantable medical device are solely for uses reasonably related to the development and submission of information to the FDA pursuant to federal law for approval of the medical device, showing that such activities are immune from claims of infringement under Section 271(e)(1). Also attached to this memorandum are copies of e-mails written by the Chairman and Directors of Plaintiff Ventrassist's parent company, Ventracor, stating that the purpose of its raising this "Patent Situation" was to move "while they [HeartWare] had no money. If we 'let' them get their $, they then have the funds to be difficult." (Exhibit 2, e-mails of Ventracor Chairman John L. Massey and Directors Ross Harricks and Elizabeth Nosworthy.)

## II. SUMMARY OF FACTS

As pointed out in the Declaration of Jeffrey LaRose, for many years HeartWare has been developing and testing its implantable heart pump (LVAD) (Exhibit 3, ¶¶ 11-18). HeartWare has numerous U.S. and Australian patents relating to its LVAD (Exhibit 3, ¶ 23). The LVAD[4] (which is an acronym for "left ventricular assist device") is a pump that is implanted in the left side of the heart in a patient whose heart is weakened by end-stage heart failure (occurring in the left ventricle). The LVAD helps a patient's heart pump the proper amount of blood in order to prolong the patient's life. HeartWare developed its LVAD in its facility in Miramar, Florida in

---

[3] HeartWare, Inc. is a subsidiary of HeartWare Limited, an Australian company. For simplicity, they will sometimes jointly be referred to as "HeartWare".

[4] HeartWare also uses the tradename "HVAD" to identify its LVAD (which is the generic name for the device).

order to provide thousands of victims of heart failure a medical device that can extend their lives (Exhibit 3, ¶ 6).

Approval by the FDA of any medical device such as the LVAD is required by a federal law, the federal Food, Drug and Cosmetic Act (the "FDCA"), 21 U.S.C. § 301 et seq., before HeatWare can sell any LVADs commercially in the United States (Exhibit 4, ¶ 8). Approval by the FDA of medical devices such as the LVAD usually requires two submissions. First, an Investigational Device Exemption (IDE) is applied for, so that the medical device may be tested in humans pursuant to § 360j(g) of the FDCA (21 U.S.C. § 360j(g)) (Exhibit 4, ¶ 9). Extensive test reports are required to be submitted with the IDE application in order to obtain the IDE.[5] (Exhibit 4, ¶ 11; Exhibit 5, ¶ 5) After receiving an IDE, according to 21 U.S.C. § 360e, implantable medical devices (Class III devices) require a PreMarket Approval (PMA) by the FDA prior to commercialing a device within the US.[6] (Exhibit 4, ¶ 9) The FDA has adopted regulations relating to its role in enforcing the statutory requirements of the FDCA. Those regulations are entitled "Food and Drugs" (the "Regulations") and found at 21 C.F.R. Pursuant to the Regulations, the PMA process involves a review of device-related information, including pre-clinical in vitro, in vivo and clinical trial data and auditing of quality systems for compliance of the design process and manufacturing according to the Quality Systems Regulation for medical devices of the FDA regulations. 21 C.F.R. 820. (Exhibit 4, ¶ 25). With a Class III

---

[5] Such IDE submissions can be very extensive, as stated by Ventracor regarding its IDE submission. "The submission totaled 10,476 bound pages of reports, clinical data and validation work." (Ventracor press release: "Application to begin US Clinical Trial - 23 December 2004.")

[6] The IDE and PMA process correlates with an Investigational New Drug application (IND) and New Drug Application (NDA) process that is described in the case law discussed below regarding 271(e)(1) exemptions for drugs.

device the PMA process may take many years before FDA approval (Exhibit 4, ¶ 24; Exhibit 5, ¶ 7).

Because the required FDA clinical testing of the LVAD will be in humans, it is necessary for HeartWare to conduct extensive studies of the LVAD device by itself in laboratories (in vitro) and in animals (in vivo) (Exhibit 4, ¶ 15). HeartWare has spent many years preparing for its FDA clinical trials in humans by such in vitro tests, to be sure that the LVAD is effective and will not cause undue risk to patients (Exhibit 3, ¶¶ 14-18). Since 2001, the LVAD has undergone extensive testing in order to develop information to demonstrate "an evaluation of the safety or effectiveness of the device," as required by Part 812.27(b)(2) of the Investigational Device Exemption Regulation of the FDA (21 C.F.R. § 812.27(b)(2) (Exhibit 3, ¶13; Exhibit 5, ¶ 11). HeartWare's LVAD has undergone minimal structural changes since 2001 (Exhibit 3. ¶¶ 19-20).

Beginning in November 2003, HeartWare retained a former FDA official, Rhona Shanker, in order to guide HeartWare's efforts to test its LVAD for FDA approval (Exhibit 4, ¶ 26). Since January 2004, HeartWare has also retained another former FDA official, Janice Piasecki, to guide HeartWare's FDA approval efforts (Exhibit 5, ¶ 9). After leaving the FDA, Ms. Piasecki was employed by Abiomed, Inc. where she was responsible for regulatory submission that resulted in FDA approval for Abiomed's implantable artificial heart (Exhibit 5, ¶ 4). Ms. Piasecki has assisted in the development of protocols and testing plans for HeartWare to follow in preparing the LVAD for FDA approval (Exhibit 5, ¶ 9).

In furtherance of HeartWare's goal of obtaining FDA approval for its LVAD, HeartWare submitted a pre-IDE package to the FDA in February 2004 (Exhibit 5, ¶ 10). In order to demonstrate the LVAD's ability to comply with the FDA's IDE requirements, HeartWare

provided the FDA with: 1) HeartWare LVAD Description; 2) Clinical Evaluation of the HeartWare Ventricular Assist Device in Patients Awaiting Cardiac Transplantation - Feasibility Study Synopsis; and 3) Protocol for In Vitro Reliability Test (Exhibit 5, Attachment E). These documents were drafted based on tests of the LVAD that were conducted by HeartWare during the previous years. HeartWare's activities have been conducted to demonstrate "an evaluation of the safety or effectiveness of the device" pursuant to 21 C.F.R. § 812.27(b)(2), in order to obtain FDA approval for HeartWare's LVAD (Exhibit 3, ¶ 13; Exhibit 5, ¶ 14).

Based on HeartWare's pre-IDE submission, on February 9, 2004, HeartWare was granted a pre-IDE number from the FDA (Exhibit 5, ¶ 12). After making the pre-IDE submission, HeartWare representatives met with representatives of the FDA in Rockville, Maryland on February 24, 2004. (Exhibit 5, ¶ 13). Since February 2004, HeartWare has continued to prepare information regarding its LVAD for HeartWare's IDE application to the FDA (Exhibit 5, ¶ 14).

In November 2004, HeartWare announced its intention to raise money for its continuing research and development activity by conducting an initial public offering of HeartWare stock ("IPO") in Australia to raise an estimated $30 million (U.S.).[7] In December 2004, HeartWare circulated to select investors a so-called Pathfinder (preliminary) Prospectus for the IPO, as required under Australian law. Plaintiffs obtained a copy of the Pathfinder Prospectus, which described HeartWare's LVAD (Exhibit 6). The prospectus made clear that HeartWare has never sold the LVAD or offered it for sale. By contrast, the prospectus described HeartWare's plans to conduct experimental LVAD human trials in the United States. Basic legal research by the Plaintiffs would have made clear that HeartWare is immune from any infringement claim pursuant to 35 U.S.C. § 271(e)(1). Notwithstanding the foregoing, Plaintiffs' counsel alleged

---

[7] HeartWare stock became listed on the Australian Stock Exchange on January 31, 2005.

infringement of its '797 and '883 patents by HeartWare's activities related to its LVAD in a letter to HeartWare dated December 13, 2004 (Exhibit 7).

On December 14, the Chairman of HeartWare Limited, Robert Thomas, and Ventracor's CEO, Colin Sutton, had a telephone call to discuss Ventracor's allegations of patent infringement. Ventracor's CEO Sutton stated that he would withdraw the cease and desist letter if HeartWare would enter negotiations for a cross-license. This was confirmed by e-mail. (Exhibit 1, e-mail stream of Ventracor's board dated between December 14 and 15, 2004).

On December 14, 2004, at 10:10 a.m., a Ventracor Director, Ross Harricks, sent an e-mail to Ventracor's other Board Members revealing Ventracor's real motive in asserting patents against HeartWare—to coerce HeartWare to negotiate a patent cross-license under HeartWare's patents and to injure HeartWare's IPO (Exhibit 1):

> This looks like a very productive action by you all. Is there some hold or lien we have that will maintain their sense of urgency to conclude the negotiations in the New Year ... such as an effective constraint on their ability to raise funds till this is concluded?

Another Ventracor Director, Elizabeth Nosworthy, who is also an attorney, stated in her e-mail, "John Ward and Colin and I agreed on this strategy as a matter of urgency before a window of opportunity closed with HeartWare." (Exhibit 1)

On December 16, 2004, Ventracor Chairman, John Massey, sent an e-mail confirming that the lawsuit was intended to coerce HeartWare into cross-license negotiations (Exhibit 1):

> Part of our timing was based on moving while they [HeartWare] had no money. If we 'let' them get their $, they then have the funds to be difficult. I am unsure what we can do about this without jeopardizing any positive negotiations.

Also on December 16, 2004, Ventracor's New Jersey counsel wrote a letter requesting a response from HeartWare to Ventracor's December 13th infringement letter by Monday, December 20, 2004, "to avoid litigation." (Exhibit 8) HeartWare's Chicago counsel quickly

responded by e-mail and by telephone, explaining that due to the short time frame the earliest a response could be provided was December 22, 2004.  But, consistent with Massey's e-mail (Exhibit 1), it became clear that Ventracor had no interest in any reasoned response from HeartWare; instead, Ventracor was intent on quickly filing the specious complaint in an attempt to coerce HeartWare into agreeing to a patent cross-license and to otherwise interfere with HeartWare's IPO.

More specifically, Ventracor caused its subsidiary, Ventrassist, to file the Complaint the next day, December 21, 2004.  However, Plaintiffs did not serve the Complaint until December 27, 2004.  Hours after filing the Complaint on December 21 (December 22 Sydney time), Ventracor posted a copy of the Complaint on its website with a press release stating that Ventracor seeks "a permanent injunction restraining HeartWare, Inc. from continuing infringing Ventracor's patents." (Exhibit 9)  Ventracor's e-mails and immediate announcement of the suit confirm that its purpose in filing the Complaint was to coerce HeartWare and to interfere with its IPO.

The Complaint alleges that HeartWare is making, using, selling and/or offering for sale products and methods that infringe the patents in suit under one or more sections of 35 U.S.C. § 271 (Exhibit 1, ¶ 9).  But HeartWare is not selling or offering for sale any "products" or "methods." (Exhibit 3, ¶ 8)  The only "product" that HeartWare is "making" or "using" is its prototype LVAD that is being tested in order to develop and submit information to the FDA to obtain FDA approval (Exhibit 3, ¶ 10).  HeartWare's activities are clearly exempt pursuant to 35 U.S.C. § 271(e)(1), as discussed in detail below.

### III. ARGUMENT

**A.     Legal Standards for Considering HeartWare's Motion to Dismiss**

In ruling on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1), "a complaint may be dismissed for lack of subject-matter jurisdiction on any one of three bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Orange Ridge, Inc. v. State*, 696 F. Supp. 600, 602 (S.D. Fla. 1988).  Under 12(b)(1), attacks on subject matter jurisdiction may be a factual attack, which challenges "the existence of subject matter jurisdiction in fact, irrespective of the pleadings." *Desporte-Bryan v. Bank of Am.*, 147 F. Supp. 2d 1356, 1359 (S.D. Fla. 2001).

When the attack is a factual one, the court has power to proceed "as it never could under 12(b)(6) or Fed. R. Civ. P. 56." *Desporte-Bryan*, 147 F. Supp. 2d at 1360.  On a motion to dismiss that challenges jurisdiction pursuant to Rule 12(b)(1), the court may look beyond the pleadings. *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980).[8]  Plaintiff bears the burden of proving the existence of subject matter jurisdiction. *Desporte-Bryan*, 147 F. Supp. 2d at 1360.  Specifically, the *Desporte-Bryan* court noted that "because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction – its very power to hear the case – there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.* (citing, *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990).  As that court further noted, "in short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court

---

[8] Decisions of the Former Fifth Circuit filed prior to October 1, 1981 constitute binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

from evaluating for itself the merits of jurisdictional claims." *Id.* Referring to what information or evidence is admissible to establish jurisdictional facts, the Federal Circuit has noted that "a court is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings, including affidavits and deposition testimony." *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993).

In ruling on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court must accept the allegations of the complaint as true and it must be "clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Afkhami v. Carnival Corp.*, 305 F. Supp. 2d 1308, 1324 (S.D. Fla. 2004). Nonetheless, to survive a motion to dismiss, a plaintiff must do more than merely label its claims. *Del Monte Fresh Produce Co. v. Dole Food Co., Inc.*, 136 F. Supp. 2d 1271, 1283 (S.D. Fla. 2001).

In addition, the Court may treat HeartWare's Rule 12(b)(6) motion as one for summary judgment and dispose of it as provided in Rule 56. See Rule 12(b). In that circumstance, the plain language of Rule 56(c) "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 1317 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The party seeking summary judgment "bears the initial burden to demonstrate to the district court the basis for its motion for summary judgment and identify those portions of the [evidence] which it believes show an absence of any genuine issue of material fact." *Hairston v. Gainsville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993). If the movant satisfies its burden, "the burden then shifts to the non-movant to establish, by going beyond the pleadings, that there exist genuine issues of material facts. *Id.*

**B.     HeartWare's Activities are Clearly Exempt from Infringement.**

In the Complaint, Plaintiffs allege that defendant is "making, using, selling and/or offering for sale products and methods that infringe upon the patents in suit under one or more sections of 35 U.S.C. § 271." (Exhibit 1, ¶ 9)  This allegation is reckless, because Plaintiffs knew or should have known that HeartWare was not "selling or offering for sale" any LVADs or methods relating to them.  As pointed out in the declaration of Jeffrey LaRose (Exhibit 3, ¶ 8), HeartWare has never offered anything for sale or sold anything, including anything related to LVADs.  In fact, any commercial offer for sale or sale of LVADs in the United States would be illegal, because HeartWare's LVAD is a medical device that has not yet been approved by the FDA.  There is no possible basis for Plaintiffs' statement regarding the allegations of "selling and/or offering for sale products and methods", and any investigation by Plaintiffs would have easily shown that such alleged activities never occurred.

With respect to Plaintiffs' allegation that HeartWare is "making" or "using" an infringing product or method, this allegation can only be related to the development of prototype LVADs by HeartWare, described above.  However, as established by the declarations attached to this memorandum, HeartWare's activities since prior to the issue of either of the patents in suit have been for the purpose of developing information concerning HeartWare's LVAD for submission to the FDA, for eventual approval of the LVAD under the FDCA and the Regulations (Exhibit 3, ¶ 24; Exhibit 4, ¶ 30; Exhibit 5, ¶ 17).  Thus, all of HeartWare's activities regarding its LVAD for FDA approval are exempt from claims of patent infringement under 35 U.S.C. § 271(e)(1), which states, in pertinent part:

> "it shall not be an act of patent infringement to make, use, offer to sell or sell . . . a patented invention ... solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs or veterinary biological products."

The U.S. Supreme Court has held that the Section 271(e)(1) infringement exemption applies to medical devices as well as to drugs. *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661 (1990). In that case, the court upheld Medtronic's §271(e)(1) exemption from infringement during clinical trials of its implantable defibrillators.

The reason for the Section 271(e)(1) exemption of medical devices from patent infringement claims is obvious. Extremely important life saving devices, such as Medtronic's implantable defibrillator or HeartWare's implantable LVAD, may require many years of development, experimentation and clinical trials before they can be approved by the FDA for commercial use. It is not uncommon for a Class III medical device, such as an implantable heart assist device, to take more than ten years to be developed and approved by the FDA. (Exhibit 4, ¶ 24; Exhibit 5, ¶ 7). Even when an application is filed with the FDA for approval of a Class III device after a number of years of development work, the FDA approval process alone may thereafter take many years. *Id.* Congress recognized that if drug and medical device manufacturers could not experiment with the drugs and medical devices prior to the expiration of a competitor's patent, then once the competitor's patent expired it would take those manufacturers many more years after such expiration before they could themselves commercialize the drug or medical device in question. If the development and FDA approval of a medical device could reasonably take ten years, for example, and if such development and clinical trials could not be exempted from patent infringement during a competitor's patent term, a new, significant, life saving medical device could not be commercialized by a manufacturer until at least ten years after the competitor's patent expired. Such a circumstance would only serve to effectively extend the patent monopoly for an additional ten years, to the significant detriment of the public.

Section 271(e)(1) was enacted to overrule a decision by the Federal Circuit, *Roche Products, Inc. v. Bolar Pharmaceutical Co.*, 733 F.2d 858 (Fed. Cir. 1984), which held to be infringing certain clinical tests of a drug necessary for FDA approval. *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 670 (1990)

In *Telectronics Pacing Systems, Inc. v. Ventritex, Inc.*, 982 F.2d 1520 (Fed. Cir. 1992), the Federal Circuit held that Ventritex, Inc., the manufacturer of an implantable defibrillator named "Cadence", was entitled to the Section 271(e)(1) exemption during its clinical trials. The patent owner had argued that certain activities by Ventritex were not exempted from infringement under Section 271(e)(1), such as: (1) Ventritex's display of its defibrillator at seven medical conferences; (2) a demonstration by Ventritex of the defibrillator to some non-physicians; (3) Ventritex's presentation of the results of the clinical trial at the medical conference; (4) fundraising by Ventritex for its defibrillator development activities; including describing the on-going clinical trial to potential investors, analysts, and journalists; (5) and mailing by Ventritex of a private placement memorandum to potential investors describing the size and progress of the clinical trial. The Federal Circuit held that Ventritex did not lose the Section 271(e)(1) exemption as a result of those activities recognizing "the need of competitors to raise funds for developing and testing competing products, and for preparing to enter the market once controlling patents had expired." *Id.* at 1525. The court further stated that "by permitting the testing and regulatory approval process to begin well before a controlling patent had run its course, Congress must have intended to allow competitors to be in a position to market their products as soon as it was legally permissible." *Id.*

In another case brought against Ventritex in connection with the same Cadence implantable defibrillator, the District Court for the Northern District of California upheld

Ventritex's immunity from infringement under Section 271(e)(1).  In referring to the basis for Section 271(e)(1), the court stated:

> "[W]e believe that in enacting this exemption Congress clearly decided that it wanted potential competitors to be able to ready themselves, fully, during the life of the patent, to enter the commercial marketplace in a large scale way as soon as the relevant patents expired.  Only by permitting this preparation to enter the market meaningfully could Congress achieve its goal of assuring the public prompt access to new medical products at the lowest commercially feasible prices."

*Intermedics, Inc. v. Ventritex, Inc.,* 775 F. Supp. 1269, 1277 (N.D. Cal.), affirmed 991 F. 2d 808 (Fed. Cir. 1993).  The district court considered whether the following activities by Ventritex during clinical trials were reasonably related to generating data for submission to the FDA, exempting Ventritex from infringement under Section  271(e)(1):

1.     manufacture of several hundred Cadences;
2.     sales of the Cadence to hospitals in the U.S.;
3.     sales of the Cadence to international distributors;
4.     testing of the Cadence (particularly certain testing done in Germany);
5.     demonstrations of the Cadence at "trade shows".

The district court converted Ventritex's Rule 12(b)(6) motion to dismiss to a summary judgment motion and then granted summary judgment for Ventritex.  75 F.Supp. at 1275, n.3, 1281, 1289.  The court held that all of the activities with respect to the Cadence implantable defibrillator were reasonably related to generating data for submission to the FDA, including Ventritex's testing activities in Germany.  *Id.* at 1282-1284.  The Federal Circuit affirmed the district court's decision, including the conversion of the Rule 12(b)(6) motion to a Rule 56 summary judgment motion.  (991  F. 2d 808 (Fed. Cir. 1993)).

All of HeartWare's pre-clinical activities are necessary for preparing a device for FDA trials and ultimate approval under the FDCA (Exhibit 4, ¶ 15; Exhibit 5, ¶ 5); accordingly, those activities are exempt under Section 271(e)(1).  Ms. Shanker, formerly an Expert Regulatory

Review Scientist for heart assist devices at the FDA, confirms that the FDA Regulations require pre-clinical testing in order for a Class III device, such as HeartWare's LVAD, to be the subject of an IDE application to the FDA (the first step in the approval process). (Exhibit 4, ¶ 15). The FDA Regulations (37 C.F.R. § 812.27), the FDA Blue Book Memorandum (Exhibit 4, Attachment A) and Ms. Shanker's article, "Long-Term Mechanical Circulatory Support System Reliability Recommendation" (Exhibit 4, Attachment B) all establish that pre-clinical testing is required for Class III devices, including HeartWare's LVAD, in order to enable those devices to be approved for FDA trials. (Exhibit 4, ¶¶ 16-20).

Further, previous Class III devices, ultimately approved by the FDA, such as the NovaCor® LVAS and the HeartMate® VE LVAS, underwent many years of extensive pre-clinical studies prior to proceeding to the IDE phase of FDA trials. (Exhibit 2, ¶ 22, Attachment C and Exhibit 5, ¶ 7, Attachment D). Therefore, as these FDA experts have provided in their declarations, substantial pre-clinical activity is a necessity before the FDA approval can even be sought and, therefore, such pre-clinical activities, as have been undertaken by HeartWare regarding its LVAD, are reasonably related to the development and submission of information to the FDA under the FDCA and the Regulations.

Where there is a decent prospect that the "use" in question would contribute (relatively directly) to the generation of kinds of information that will likely to be relevant to the processes by which the FDA will decide whether or not to approve the product, such a "use" is exempt. *Intermedics*, 775 F. Supp at 1280-81. HeartWare's pre-clinical activities are clearly "uses" that contribute directly to the development and submission of information to the FDA likely to be relevant to the FDA approval process. "[U]nless the court is confronted with the extreme case in which either it is clear that certain otherwise infringing activities are outside the FDA approval

14

process or the FDA itself affirmatively indicates that a party's activities are not reasonably related to obtaining its approval, the court will not find that accused activities that a defendant objectively believes could generate information that is likely to be relevant to the FDA approval process are not 'reasonably related' to obtaining FDA approval." *Nexell Therapeutics, Inc. v. Amcell Corp.*, 199 F. Supp. 2d 197, 203 (D. Del. 2002). Also *see Nexell Therapeutics, Inc. v. Amcell Corp.*, 143 F. Supp. 2d 407 (D. Del. 2001). In Nexell, the court found that defendant Amcell's activities surrounding its Class III medical device (cell separation device), including marketing, promotional and testing activities for the device and submission of a pre-IDE package to the FDA, were exempt under Section 271(e)(1).

As set forth in the Declaration of Jeffrey LaRose, HeartWare's activities have been narrowly focused on testing its prototype LVAD for FDA approval. (Exhibit 3, ¶ 10). Since at least 2001, the LVAD has undergone assessment and testing in order to develop information to demonstrate an evaluation of the safety and effectiveness of the device pursuant to the IDE Regulation of the FDA (21 C.F.R § 812.27(b)(2)) (Exhibit 3, ¶¶ 11-18; Exhibit 5, ¶ 14).

Finally, in his declaration, Mr. LaRose, HeartWare's Chief Scientific Officer, has provided a detailed description of the LVAD configuration elements and photographs comparing HeartWare's current LVAD with an LVAD prototype from November 2000. (Exhibit 3, Table 1 and Attachment G). These photographs demonstrate that HeartWare's activities have revolved around essentially the same LVAD since 2001. HeartWare has not been experimenting with different types of ventricular assist devices or screening different types of cardiovascular devices to see which one it may eventually submit to the FDA for approval. Rather, HeartWare's activities have been narrowly focused on one particular LVAD in order to evaluate its safety and effectiveness for eventual FDA approval.

Mr. LaRose and two former FDA officials with expertise in the area of cardiovascular devices have reviewed HeartWare's past activities and all have concluded that such activities were solely for uses reasonably related to the development and submission of information to the FDA under the FDCA and the Regulations. (Exhibit 3, ¶24, Exhibit 4, ¶30 and Exhibit 5, ¶17.)

**C.     This Action was Brought by Plaintiffs in Bad Faith**

Plaintiffs are relatively large entities, with substantial capital, that filed this action against HeartWare, a small company needing extensive experimentation and clinical trials in order provide to the public an important life saving medical device. After spending millions of dollars on research and development of its implantable heart pump, HeartWare has finally been able to meet with the FDA to begin to take the appropriate steps to enable it to file an application for approval with the FDA. HeartWare proceeded with an IPO in Australia to obtain the necessary funding for allowing its development efforts and clinical trials to proceed. As discussed above, the evidence shows that Plaintiffs clearly knew that a patent infringement action against HeartWare would place a tremendous financial hardship upon HeartWare and that any such action could seriously thwart investments in HeartWare. As the Ventracor e-mails, letters and press release demonstrate (Exhibits 2 and 6-9), Plaintiffs' real purpose was to use the patent infringement lawsuit and threats of such a lawsuit to coerce HeartWare into granting Plaintiffs a license under the HeartWare patents and to otherwise damage HeartWare's Australian IPO.

Notwithstanding Plaintiffs knowledge of HeartWare's condition and notwithstanding Plaintiff's knowledge that HeartWare's activities are immune from patent infringement claims, Plaintiffs brought this action. In a communication with HeartWare's counsel, counsel for Plaintiffs improperly relied on the case of *Integra LifeScience v. Merck.* 331 F.3d 860 (Fed. Cir. 2003) 2003 U.S. App. LEXIS 27796, as alleged support for filing this lawsuit (Exhibit 8). In

fact, the *Integra* case is inapplicable to the present case and is presently under review.[9]  In the *Integra* case, the Federal Circuit held that Section 271(e)(1) was not applicable to Merck's experimental research that was conducted simply to identify the best drug candidate for possible future clinical testing (2003 U.S. App. LEXIS 27796 at 15).  In other words, the court held only that the exception does not apply to Merck's general biomedical research activities to identify and to develop new drugs.  ("In this case, the [work] was not clinical testing to supply information to the FDA, but only general biomedical research to identify new pharmaceutical compounds."  (*Id.*).  In sharp contrast, many years ago (prior to the issuance of either of the patents in suit), HeartWare identified and focused upon a specific LVAD device and has been engaged in ongoing testing of that device in order to develop and submit information to the FDA pursuant to the FDCA and the Regulations, which is exactly what Section 271(e)(1) is intended to exempt from infringement.

**D.    Dismissal of the Complaint is Proper Based on This Motion Pursuant to Rules 12(b)(1) and 12(b)(6)**

    **1.    Subject Matter Jurisdiction is Lacking**

As provided above, Plaintiffs have failed to allege facts sufficient to support its subject matter jurisdiction based on 28 U.S.C. §1338(a), which grants district courts original jurisdiction of "any civil action arising under any act of Congress relating to patents."  As has been shown above and supported by the attached declarations, Plaintiffs have not properly plead infringement under the patent statute, because HeartWare's activities are exempt under Section 271(e)(1).  This Court is entitled to rely on the declarations submitted by HeartWare in order to make its finding that subject matter jurisdiction is lacking.  *Cedars-Sinai Medical Center*, 11 F.3d at 1584.

---

[9] The *Integra* decision by the Federal Circuit was a split decision which will be reviewed by the U.S. Supreme Court (*certiorari* was granted on January 7, 2005; Docket No. 03-1237.

As it has been established by these declarations that HeartWare's activities are solely for uses reasonably related to the development and submission of information to the FDA under the FDCA and Regulations, such activities are exempt under Section 271(e)(1). Therefore, this Court lacks subject matter jurisdiction over the Complaint and the Complaint should be dismissed.

### 2.    Plaintiffs Fail to State a Claim Upon Which Relief May Be Granted

As discussed above, HeartWare's activities fall under the exemption of Section 271(e)(1), which trumps any claim for patent infringement under Section 271. As there is no proper allegation of infringement made in the Complaint, the Complaint fails to state a claim upon which relief may be granted, and should be dismissed under Rule 12(b)(6). *Afkhami*, 305 F. Supp. 2d at 1324. In order to survive a motion to dismiss, the Plaintiff must do more than merely label its claims. *Delmonte Fresh Produce Company*, 136 F. Supp. 2d at 1283. Here Plaintiffs have merely labeled their allegations as a claim for patent infringement under Section 271, but they have failed to properly plead infringement, because they have not provided anything to show that HeartWare's activities are not exempt under Section 271(e)(1). Therefore, Plaintiffs have failed to state a claim, and the Complaint should be dismissed pursuant to Rule 12(b)(6).

### 3.    Summary Judgment is Proper in View of the Exhibits Attached to This Memorandum

Fed. R. Civ. P. 12(b) allows the Court to treat a motion to dismiss under Rule 12(b)(6) "as one for summary judgment as provided in Rule 56." Under Rule 12(b), the Court may consider the declarations and attachments included with this memorandum and make its ruling based on such information. HeartWare has provided more than sufficient proof with the attached declarations and attachments to support the entry of summary judgment against Plaintiffs regarding their complaint for patent infringement.

18

## IV. CONCLUSION

The Section 271(e)(1) exemption was intended to cover a situation such as the one presented here.   In view of HeartWare's exemption under Section 271(e)(1) from patent infringement claims, the Complaint should be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) and failure to state a claim under Rule 12(b)(6).   In the alternative, HeartWare should be granted summary judgment on all claims in the Complaint pursuant to Rule 56.   The propriety of such a result is underscored by the fact that Plaintiffs' real motive in bringing this action was not to see that justice was done, but to coerce HeartWare into an unwanted cross-licensing agreement and to frustrate HeartWare's attempt to obtain needed funds through its Australian IPO.

Respectfully submitted,

FELDMAN GALE, P.A.
Miami Center, Suite 1920
201 S. Biscayne Blvd.
Miami FL 33131
Tel: (305) 358-5001
Fax: (305) 358-3309

By:_____

James A. Gale
Florida Bar No. 371726
jgale@FeldmanGale.com
Gregory L. Hillyer
Florida Bar No. 682489
ghillyer@FeldmanGale.com

-AND-

George H. Gerstman, Esq. (*pro hac vice*)
David L. Newman, Esq. (*pro hac vice*)
SEYFARTH SHAW LLP
55 East Monroe Street
Suite 4200
Chicago, Illinois 60603

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that a true and correct copy of the foregoing has been sent

via U.S. Mail this 7th day of February 2005 to: Jeffrey I. Kaplan, Esq., Kaplan & Gilman, L.L.P.,

900 Route 9 North, Woodbridge, NJ 07095 Marc J. Gottlieb, Esq., Akerman Senterfitt, Las Olas

Centre II, Suite 1600, 350 East Las Olas Blvd., Ft. Lauderdale, FL 33301-2229

# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

04 - 61703 CIV-MARRA MAGISTRATE JUDGE

| | | |
|---|---|---|
| Ventrassist Pty Ltd. and University of Technology at Sydney, | : | |
| Plaintiffs, | : | Civil Action No. |
| v. | : | **COMPLAINT FOR PATENT INFRINGEMENT AND JURY DEMAND** |
| Heartware Inc., | : | |
| Defendant. | X | |

FILED BY

2004 DEC 21  PM 3:4

CLERK
S.D. OF FLA - FT

## COMPLAINT

Plaintiffs, by their undersigned attorneys, for their Complaint against Defendant, allege as follows:

### JURISDICTION AND VENUE

1.      This cause of action arises under the Patent Laws of the United States, 35 U.S.C. § 101 et. seq.

2.      Jurisdiction of the subject matter of this action is conferred on this Court by 28 U.S.C. § 1338(a).

3.      Upon information and belief, Defendant has a principle place of business in this district, transacts business within this district, advertises and sells products and services within this district, derives substantial revenues from intra-state and inter-state commerce and has committed acts of patent infringement within this district and also without this district having injurious

{PT253018;1}

consequences within this district, and Defendant is otherwise within the jurisdiction of this court. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 and 28 U.S.C. § 1400.

## THE PARTIES

4.   Plaintiff Ventrassist Pty Ltd. ("Ventrassist") is a Australian Corporation having a principle place of business at 126 Greville Street, Chatswood NSW 2067, Australia.

5.   Plaintiff University of Technology at Sydney ("UTS") is a university located in Sydney, Australia.

6.   Upon information and belief, Defendant Heartware, Inc. ("Heartware") is a Florida Corporation having a principle, regular and established place of business at 3351 Executive Way, Miramar, Florida 33025.

7.   Defendant entity is collectively referred to herein as Defendant, except where specifically noted.

## ALLEGATIONS

8.   Plaintiffs are the owners by assignment of all rights, title and interest, of United States Patent Nos. 6,227,797 and 6,609,883 ("the patents in suit"), directed generally to a ventricular assist device, (VAD) for use in patients suffering from heart failure.

9.   Defendant is making, using, selling and/or offering for sale products and methods that infringe upon the patents in suit under one or more sections of 35 U.S.C. §271 and is liable as direct, contributory, and/or inducers of the infringement.

{FT253018;1}

2

10. Defendant continues to make, use, sell and/or offer for sale products and/or methods that infringe upon plaintiff's patent rights, and is believed to have full knowledge of such rights, and the intent to continue infringing such rights. Defendant's infringement is willful.

## COUNT I - PATENT INFRINGEMENT OF U.S. PATENT NOS. 6,227,797 and 6,609,883

11. Plaintiffs re-allege all of the foregoing paragraphs as if fully set forth herein.

12. Defendant is liable to plaintiffs for damages for patent infringement.

13. All of the acts of Defendant is without the permission, license or consent of Plaintiffs and, if allowed to continue, will cause irreparable injury to Plaintiffs, unless enjoined by the Court.

14. Defendant have been unjustly enriched and Plaintiffs are entitled to an accounting and award of damages, interest, attorneys' fees and costs.

15. Defendant's foregoing activities have damaged Plaintiffs in an amount as yet unknown, but if Defendant's foregoing activities continue, Plaintiff believes damages will be many millions of dollars.

## JURY DEMAND

16. Plaintiffs hereby demand trial by jury.

## PRAYER

**WHEREFORE,** Plaintiffs demand judgment, including:

A.      A declaration that Defendant's products and services infringe  United States Patent Nos. 6,227,797 and 6,609,883, and that such infringement is, was and will continue to be willful;

{FT253018;1}

B.     An accounting and award for damages, interest, attorneys' fees and costs of this action;

C.     An award of treble damages for Defendant's willful infringement of the patents in suit;

D.     A permanent injunction against Defendant, prohibiting the continuance of their infringing activities; and

E.     Such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: December 21, 2004

AKERMAN SENTERFITT
Attorneys for Plaintiff
Las Olas Centre II, Suite 1600
350 East Las Olas Blvd.
Fort Lauderdale, FL  33301
Telephone:  (954) 463-2700
Facsimile:  (954) 463-2224
E-mail:  Marc.Gottlieb@akerman.com

By:_____
        Marc J. Gottlieb
        Florida Bar No.: 0827819
        Joseph W. Bain
        Florida Bar No.: 860360

KAPLAN & GILMAN, L.L.P.
Jeffrey I. Kaplan (JK 4706)
Attorneys for Plaintiff
900 Route 9 North
Woodbridge, NJ 07095
Telephone (732) 634-7634
Facsimile (732) 634-6887
E-Mail: jkaplan@kaplangilman.com

{FT253018;1}

4

# EXHIBIT 2

-----Original Message-----
**From:** Elizabeth Nosworthy [mailto:enosworthy@manaton.com.au]
**Sent:** Wednesday, 15 December 2004 08:00 PM
**To:** 'John C. Massey'; 'Ross Harricks'; 'Colin Sutton'; Thomas, Rob [EQTY]
**Cc:** 'Bernadette Kerrigan'; 'Anthony Alder'; 'John Ward'; 'Katherine Woodthorpe'; 'Ross Harricks'
**Subject:** RE: Patent Situation

John

When I spoke to Rob Thomas, Heartware Chairman, he told me (very confidently) that HIS legal advice was:

1. Our cease and desist letter is ineffective until they are actually manufacturing and using a device which they are not currently doing. Therefore they have not yet infringed our patent.

2. Our patent is defective in a umber of ways and their patent is superior.

He said that, if we did not agree to withdraw our letter to let his prospectus go forward, he would disclose the existence of our letter in his prospectus AND give a detailed statement about his legal advice on the defects in our patent.

On the basis that this would do nothing but damage us, it seemed preferable to retreat now on the condition that he negotiate about cross licensing - which he said he would be happy to do. We may have lost some negotiating advantage but statements adverse to us in his prospectus would not have helped us either.

On the issue of continuous disclosure by us, I would be reluctant to make a disclosure at this stage. Firstly, I would like to understand better why it is that he thinks our patent has defects and his does not. If he is right and we are wrong, a statement to the market now about infringement could be misleading. Further, if his point is right that, technically, there is no infringement until they actually start using a device, then we may not be on solid ground. Finally, until we actually start negotiating a cross licence I would be loath to tell the market. Again, the negotiations may fall over and we may have spoken too soon. I think we need more info and more certainty before we go public with anything.

kind regards

Elizabeth

-----Original Message-----
**From:** John C. Massey [mailto:jcm@bigpond.net.au]
**Sent:** Thursday, 16 December 2004 12:01 PM
**To:** Ross Harricks; Elizabeth Nosworthy; 'Colin Sutton'; rob.thomas@citigroup.com
**Cc:** 'Bernadette Kerrigan'; 'Anthony Alder'; 'John Ward'; 'Katherine Woodthorpe'; 'Ross Harricks'

**Subject:** Re: Patent Situation

All,

Ross raises an issue which is concerning me. Part of our timing was based on moving while they had no money. If we "let" them get their $, they then have the funds to be difficult. I am unsure what we can do about this without jeopardising any positive negotiations.

Also, we consider and are aware that Heartwear breaches our patent position (as shown by our cease and desist letter and earlier advices over a period), they are raising funds in the market - I suspect they have a disclosable event with relevance to their Prospectus. This is their problem.

However, do we have a Continuous Disclosure issue, too? Is it significant that we are aware that our patents are being infringed even to the extent that we issued a cease and desist letter in the US? (Even if we withdraw it, we did it). Also, is it significant that we intend to negotiate cross licences? Does the market have a right to know? I would suspect a case can be made.

I am also concerned that we will appear publically as the weaker party. If this is in fact the case, then so be it. But, why should our company and shareholders be adversely affected if it is not the case?

Maybe I have too much time to worry about these issues at present but they are occupying my mind and therefore needed to share them Any views?

Best wishes,

John C. Massey
jcm@bigpond.net.au
P.O. Box 2088, Ascot. Queensland. 4007. Australia.
Telephone : +61-7-3868 4958 Fax : +61-7-3268 6996

This email (including any file attachments transmitted with it) is for the sole use of the intended recipient(s) and may contain confidential and privileged information. If you have received this email in error, please notify the sender by return email and destroy all copies of the original message.

----- Original Message -----

**From:** Ross Harricks

**To:** Elizabeth Nosworthy ; 'Colin Sutton' ; rob.thomas@citigroup.com

**Cc:** 'Bernadette Kerrigan' ; 'Anthony Alder' ; 'John Massey' ; 'John Ward' ; 'Katherine Woodthorpe' ; 'Ross Harricks'

**Sent:** Tuesday, December 14, 2004 10:10 PM

**Subject:** RE: Patent Situation

Elizabeth, Colin, John

This looks like a very productive action by you all. Is there some hold or lien we have that will maintain their sense of urgency to conclude the negotiations in the

new year .. such as an effective constraint on their ability to raise funds till this is concluded ?

kind regards

Ross

*Elizabeth Nosworthy <enosworthy@manaton.com.au>* wrote:

Thanks Colin.

For the rest of the Board: this is the result of discussions today between me and the Chairman of Heartware followed by discussions between me and each of John Ward and Colin. Heartware are now alive to our issues and there is an opportunity to negotiate a productive outcome. John Ward and Colin and I agreed on this strategy as a matter of urgency before a window of opportunity closed with Heartware.

best regards

Elizazbeth

-----Original Message-----
**From:** Colin Sutton [mailto:colin.sutton@ventracor.com]
**Sent:** Tuesday, 14 December 2004 4:37 PM
**To:** rob.thomas@citigroup.com
**Cc:** 'Bernadette Kerrigan'; 'Anthony Alder'; Elizabeth Nosworthy; John Massey; John Ward; Katherine Woodthorpe; 'Ross Harricks'
**Subject:** Patent Situation

Dear Rob

I appreciated the chance this afternoon to discuss the patent matters affecting our companies and the 'cease and desist letter' that Ventracor's attorney has sent to Heartware Inc. It is apparent that there is an opportunity for us to move forward into productive discussions aimed resolving this matter.

Therefore I confirm that Ventracor would be prepared to withdraw the letter provided we receive a commitment to enter into negotiations in regard to a potential cross-licence for the infringing patents. As indicated these negotiations should begin prior to Christmas so that we can move forward early in 2005.

I confirm that there has been no public statement by Ventracor on this issue.

We look forward to your early response so that we can instruct our attorney accordingly.

Regards

Colin

Colin Sutton PhD

Chief Executive Officer

Ventracor Limited

126 Greville Street

Chatswood NSW 2067

Australia

+61 2 9406 3088 T

+61 2 9406 3124 F

0418 290 884 M

colin.sutton@ventracor.com

# EXHIBIT 6



Dear Mr. Gerstman:

Please find attached our client's response to your letter of December 14th, 2004.

Please call me if you wish to discuss this matter further.

Jeffrey I. Kaplan, Esq.
KAPLAN & GILMAN, L.L.P.
900 Route 9 North
Woodbridge, New Jersey 07095
Telephone (732) 634-7634
Facsimile (732) 634-6887

# EXHIBIT 7

# KAPLAN & GILMAN, L.L.P.    COUNSELORS AT LAW

900 ROUTE 9 NORTH
WOODBRIDGE, NEW JERSEY 07095
TELEPHONE (732) 634-7634
FACSIMILE (732) 634-6887
WWW.KAPLANGILMAN.COM

MICHAEL R. GILMAN*
JEFFREY I. KAPLAN
TIMOTHY X. GIBSON
MATTHEW B. DERNIER
LESLIE S. GARMAISE**

PATENT AGENT
LI ZHENG***
*ADMITTED NY & CT ONLY
**ADMITTED IN CO, IL, AND TX ONLY
***ADMITTED CHINA ONLY

December 13, 2004

**VIA FACSIMILE AND E-MAIL**
Mr. Stuart McConchie, CEO
Heartware, Inc.
3351 Executive Way
Miramar, FL 33025

Re:    **U.S. Patent Nos. 6,227,797 and 6,609,883**

Dear Mr. McConchie:

This law firm represents Ventracor Limited of Australia, and its subsidiary, Ventrassist Pty, Ltd. in intellectual property matters, and in particular, with respect to enforcement of its United States Letters Patent Nos. 6,227,797 and 6,609,883. These patents relate to the use of hydrodynamic bearing surfaces in pumps. We draw your attention, by way of example only, to claims 13 and 26 of the '797 patent and claim 58 of the '883 patent.

Our client has recently informed us that your company is manufacturing and/or marketing a product that we believe falls within the scope of the claims of the above identified patents. This product is apparently referred to by your company as the Heartware HVAD. Additionally, our information reveals that there are other products being used by your company that relate to the same core technology.

In order to avoid litigation, our client demands that Heartware cease and desist from all infringing commercial activities involving the HVAD devices in issue, and account to our client for any past damages.

In the event we do not receive a commitment from you to comply with the above by the close of business on Friday, December 17, 2004, we have been instructed to proceed fully with the litigation.

Your prompt attention to this important matter is appreciated.

Very truly yours,

KAPLAN & GILMAN, L.L.P.

Jeffrey I. Kaplan
jkaplan@kaplangilman.com

JIK/pa
Enclosures
F:\Clients\Ventacor-597.592-5 - Heartware litigation\C&D ltr to Heartware - FINAL.doc

**EXHIBIT 8**

# KAPLAN & GILMAN, L.L.P.  COUNSELORS AT LAW

)00 ROUTE 9 NORTH
WOODBRIDGE, NEW JERSEY 07095
TELEPHONE (732) 634-7634
FACSIMILE (732) 634-6887
WWW.KAPLANGILMAN.COM

MICHAEL R. GILMAN*
JEFFREY I. KAPLAN
TIMOTHY X. GIBSON
MATTHEW B. DERNIER
LESLIE S. GARMAISE**

PATENT AGENT
LI ZHENG***

*ADMITTED NY & CT ONLY
**ADMITTED IN CO, IL, AND TX ONLY
***ADMITTED CHINA ONLY

December 16, 2004

**VIA EMAIL**
George H. Gerstman, Esq.
Seyfarth Shaw LLP
55 East Monroe Street
Chicago, Illinois 60603

Re:  **U.S. Patent Nos. 6,227,797 and 6,609,883  Ventracor/Ventrassist and Heartware**

Dear Mr. Gerstman:

We are writing in response to your letter of December 14th, 2004, threatening lawsuits for the letter we previously sent. With due respect, your threats are unfounded and your representations conflict with the documents published by your own client.

You indicate that there is no need to comment upon the validity of the above patents. Note that U.S. patents are entitled to a statutory presumption of validity pursuant 35 U.S.C. §282. Neither we, nor our client, has any information at this time that would tend to indicate that any of the claims in issue are invalid. If you have such information, please forward it for our consideration.  If you do not, then we do not understand your purpose in raising the issue.

Your letter states that "Heartware is not manufacturing any medical device...Heartware is not engaging in anything that could possibly be considered an infringing act..." Our information indicates to the contrary, but we would welcome any information you have that indicates our investigation is incorrect. According to our information obtained, Heartware's "manufacturing facility is in Miramar, Florida" (p. 9) Additionally, there are other devices that have been manufactured, such as the MVAD, that use the same technology as the more developed HVAD. (p. 10).  Heartware has "performed a series of preclinical studies of its HVAD in vitro and in animals..to assess anatomical fitting, design, pump mechanics and long term compatibility with blood components" (p. 31).  Note these preclinical activities are not subject to any infringement exemption under 35 USC § 271(e). See *Integra Lifesciences I, Ltd. v Merck* 331 F.3d 860 (Fed. Cir. 2003).  In any event, our information indicates that the tests are for approval first of foreign regulatory agencies.

George Gerstman, Esq.
December 16 , 2004
Page 2


        Note also that photographs we have obtained of the Heartware device in issue show and describe the
hydrodynamic surface that is the subject of the claims in issue.

        Given the above, as well as the other information that we have that reinforces the foregoing, it is our
belief presently that the activities reported by Heartware constitute infringement of our client's patent rights.
Additionally, we note that you have presented us with no argument as to noninfringement or invalidity of the
patent rights at issue.

        Please note that your threats concerning holding our client and us liable for damages do not serve to
move the matter forward in any meaningful way.  Additionally, based upon the above, the initiation of any
suit by Heartware and/or your law firm based upon the allegations in your December 14th letter would not
meet Federal Rule of Procedure 11.   On the other hand, if you believe our information above is incorrect, or
that for some other reason our assertion of infringement is unwarranted, please let me know immediately. I
assure you we will consider your position on the merits and respond promptly, and that we do not wish to
proceed with unwarranted claims.

        Please let me hear from you regarding the above by the close of business on Monday, December 20th.
to avoid litigation.

        Thank you in advance for your consideration of this matter.




                                    Very truly yours,
                                    KAPLAN & GILMAN, L.L.P.


                                    /Jeffrey I. Kaplan/


                                    Jeffrey I. Kaplan
                                    jkaplan@kaplangilman.com
JIK/pa
F:\Clients\Ventacor-592\592-5 - Heartware litigation\C&D ltr to Heartware - FINAL.doc

George Gerstman, Esq.
December 16 , 2004
Page 3


Patents                    Trademarks              Copyrights              Licensing              Litigation

# EXHIBIT 9



## asx announcement

## Ventracor Limited and Heartware Inc

**Sydney, 22 December 2004:** Australia's Ventracor Limited (ASX: VCR) last night commenced legal action in the United States District Court for the Southern District of Florida against American company Heartware Inc which it believes is infringing two of Ventracor's established US patents for its leading cardiac assist device, the VentrAssist™ left ventricular assist system (LVAS).

Ventracor Chief Executive Officer, Colin Sutton PhD said: "Ventracor has always clearly stated it will vigorously defend its broad patent portfolio and the integrity of its Australian-developed intellectual property."

The suit filed on Tuesday, US time, seeks a judgment that Heartware Inc is willfully infringing Ventracor's US Patent No. 6,227,797 and 6,609,883, an award for damages, including treble damages for willful infringement, interest and attorney's fees and a permanent injunction restraining Heartware Inc from continuing infringing Ventracor's patents.

"Last week Ventracor issued Heartware with a letter requesting the company 'cease and desist' from 'using and manufacturing' the Heartware heart ventricular assist device (HVAD).

"As Heartware has failed to provide an assurance it will comply with the cease and desist letter, Ventracor was left with no option but to proceed to protect its patent portfolio," Dr Sutton said.

Full copies of the documents filed are attached. Full copies of the two patents are available at *www.ventracor.com.*

Ventracor's two US patents relate to rotary pumps adapted for use as artificial hearts or ventricular assist devices. They cover a seal-less, shaft-less pump featuring open or closed impeller blades with the edges of the blades used as hydrodynamic thrust bearing and with electromagnetic torque provided by the interaction between magnets embedded in the blades and a rotating current pattern generated in coils fixed relative to the pump housing.

*Page one of two*

Ventracor Limited 126 Greville Street Chatswood NSW 2067 Australia
T +61 2 9406 3100 F +61 2 9406 3101 W www.ventracor.com
ABN 46 003 180 372

**About Ventracor**

Ventracor has successfully completed a pilot trial to establish the safety of the VentrAssist™ left ventricular assist system (LVAS) and is currently conducting a pivotal trial (CE Mark Trial) at leading transplant hospitals in Australia, New Zealand and Europe aimed at gathering data to support a CE marking application and permission to begin making sales in the major market of Europe. Ventracor will file an Investigational Device Exemption (IDE) application to the US FDA before the end of the year.

The company is focused on commercialising the VentrAssist ™ for patients in cardiac failure and bringing it to global markets in record time. Ventracor is confident of obtaining a significant share of the massive LVAS market, which independent analysts expect to be valued at between $US7.5 billion and US$12 billion in coming years.

*For further information, visit www.ventracor.com or contact:*

*Bernadette Kerrigan*
*Company Secretary & Legal Counsel*
*Ventracor Limited*
*(02) 9406 3095*

*Colin Sutton*
*Chief Executive Officer*
*Ventracor Limited*
*(02) 9406 3100*

*Page two of two*

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

04 - 61703 CIV-MARRA MAGISTRATE JUDGE

| | | |
|---|---|---|
| Ventrassist Pty Ltd. and University of | : | |
| Technology at Sydney, | : | |
| | : | Civil Action No. |
| Plaintiffs, | : | |
| | : | |
| v. | : | **COMPLAINT FOR PATENT** |
| | : | **INFRINGEMENT AND** |
| Heartware Inc., | : | **JURY DEMAND** |
| | : | |
| Defendant. | X | |

FILED BY
2004 DEC 21 PM 3:4
CLERK
S.D. OF FLA - FTL

## COMPLAINT

Plaintiffs, by their undersigned attorneys, for their Complaint against Defendant, allege as follows:

### JURISDICTION AND VENUE

1.      This cause of action arises under the Patent Laws of the United States, 35 U.S.C. § 101 et. seq.

2.      Jurisdiction of the subject matter of this action is conferred on this Court by 28 U.S.C. § 1338(a).

3.      Upon information and belief, Defendant has a principle place of business in this district, transacts business within this district, advertises and sells products and services within this district, derives substantial revenues from intra-state and inter-state commerce and has committed acts of patent infringement within this district and also without this district having injurious

{PT253018;1}

consequences within this district, and Defendant is otherwise within the jurisdiction of this court. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 and 28 U.S.C. § 1400.

## THE PARTIES

4.  Plaintiff Ventrassist Pty Ltd. ("Ventrassist") is a Australian Corporation having a principle place of business at 126 Greville Street, Chatswood NSW 2067, Australia.

5.  Plaintiff University of Technology at Sydney ("UTS") is a university located in Sydney, Australia.

6.  Upon information and belief, Defendant Heartware, Inc. ("Heartware") is a Florida Corporation having a principle, regular and established place of business at 3351 Executive Way, Miramar, Florida 33025.

7.  Defendant entity is collectively referred to herein as Defendant, except where specifically noted.

## ALLEGATIONS

8.  Plaintiffs are the owners by assignment of all rights, title and interest, of United States Patent Nos. 6,227,797 and 6,609,883 ("the patents in suit"), directed generally to a ventricular assist device, (VAD) for use in patients suffering from heart failure.

9.  Defendant is making, using, selling and/or offering for sale products and methods that infringe upon the patents in suit under one or more sections of 35 U.S.C. §271 and is liable as direct, contributory, and/or inducers of the infringement.

{FT253018;1}

2

10. Defendant continues to make, use, sell and/or offer for sale products and/or methods that infringe upon plaintiff's patent rights, and is believed to have full knowledge of such rights, and the intent to continue infringing such rights.  Defendant's infringement is willful.

## COUNT I - PATENT INFRINGEMENT OF U.S. PATENT NOS. 6,227,797 and 6,609,883

11. Plaintiffs re-allege all of the foregoing paragraphs as if fully set forth herein.

12. Defendant is liable to plaintiffs for damages for patent infringement.

13. All of the acts of Defendant is without the permission, license or consent of Plaintiffs and, if allowed to continue, will cause irreparable injury to Plaintiffs,  unless enjoined by the Court.

14. Defendant have been unjustly enriched and Plaintiffs are entitled to an accounting and award of damages, interest, attorneys' fees and costs.

15. Defendant's foregoing activities have damaged Plaintiffs in an amount as yet unknown, but if Defendant's foregoing activities continue, Plaintiff believes damages will be many millions of dollars.

## JURY DEMAND

16. Plaintiffs hereby demand trial by jury.

## PRAYER

**WHEREFORE,** Plaintiffs demand judgment, including:

A.      A declaration that Defendant's products and services infringe  United States Patent Nos. 6,227,797 and 6,609,883, and that such infringement is, was and will continue to be willful;

{FT253018;1}

3

B.	An accounting and award for damages, interest, attorneys' fees and costs of this action;

C.	An award of treble damages for Defendant's willful infringement of the patents in suit;

D.	A permanent injunction against Defendant, prohibiting the continuance of their infringing activities; and

E.	Such other and further relief as the Court deems just and proper.


Respectfully submitted,


Dated: December 21 , 2004

AKERMAN SENTERFITT
Attorneys for Plaintiff
Las Olas Centre II, Suite 1600
350 East Las Olas Blvd.
Fort Lauderdale, FL  33301
Telephone:  (954) 463-2700
Facsimile:  (954) 463-2224
E-mail:  Marc.Gottlieb@akerman.com


By:_____
	Marc J. Gottlieb
	Florida Bar No.: 0827819
	Joseph W. Bain
	Florida Bar No.: 860360

KAPLAN & GILMAN, L.L.P.
Jeffrey I. Kaplan (JK 4706)
Attorneys for Plaintiff
900 Route 9 North
Woodbridge, NJ 07095
Telephone (732) 634-7634
Facsimile (732) 634-6887
E-Mail: jkaplan@kaplangilman.com

{FT253018;1}

4

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| VENTRASSIST PTY LTD., 126 GREVILLE STREET, CHATSWOOD NSW 2067, AUSTRALIA; UNIVERSITY OF TECHNOLOGY AT SYDNEY, SYDNEY, AUSTRALIA | HEARTWARE INC., 3351 EXECUTIVE WAY, MIRAMAR, FLORIDA 33025 |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT

EXCEPT IN U.S. PLAINTIFF CASES **04 - 61703 CIV CANBRA**

(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) MARC J. GOTTLIEB, ESQ., AKERMAN SENTERFITT, 350 E. LAS OLAS BLVD., SUITE 1600, FORT LAUDERDALE, FL 33301; 954-463-2700/954-463-2224 | ATTORNEYS (IF KNOWN)   MAGISTRATE JUDGE |
|---|---|

(d) CIRCLE COUNTY WHERE ACTION AROSE:   MONROE, **BROWARD**, PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE, HIGHLANDS

| II. BASIS OF JURISDICTION (PLACE AN X IN ONE BOX ONLY) | III. CITIZENSHIP OF PRINCIPAL PARTIES (For Diversity Case Only) (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) | | | |
|---|---|---|---|---|
| | | PTF | DEFS | |
| 1. U.S. Government Plaintiff   X 3. Federal Question (U.S. Government Not a Party) | Citizen of This State | □ 1 | □ 1 | Incorporated of Principal Place of Business in This State   □ 4   □ 4 |
| 2. U.S. Government Defendant   4. Diversity (Indicate Citizenship of Parties in item III) | Citizen of Another State | □ 2 | □ 2 | Incorporated of Principal Place of Business in Another State   □ 5   □ 5 |
| | Citizen or Subject of a Foreign Country | □ 3 | □ 3 | Foreign Nation   □ 6   □ 6 |

IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.) **This action is brought pursuant to 35 U.S.C. 271 PATENT INFRINGEMENT.**

IVa.   **TEN (10)**   days estimated (for both sides) to try entire case

## V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)

| A. CONTACT | A. TORTS | | FORFEITURE PENALTY | A. BANKRUPTCY | A. OTHER STATUS |
|---|---|---|---|---|---|
| | **PERSONAL INJURY** | | B □ 610 Agriculture | □ 422 Appeal 26 USC 156 | □ 400 States Reappointment |
| □ 110 Insurance | □ 310 Airplane | **PERSONAL INJURY** | B □ 620 Other Food & Drug | | □ 410 Antitrust |
| □ 120 Marine | □ 315 Airplane Product Liability | □ 362 Personal Injury-Med Malpractice | B □ 625 Drug Related Seizure of Property 21 USC 881 | □ 423 Withdrawal 28 USC 157 | □ 430 Banks and Banking |
| □ 130 Miller Act | | | | | B □ 450 Commerce/ICC Rates/etc. |
| □ 140 Negotiable Instrument | □ 320 Assault, Libel and Slander | □ 365 Personal Injury-Product Liability | B □ 630 Liquor Laws | **A. PROPERTY RIGHTS** | □ 460 Deportation |
| □ 150 Recovery of Overpayment & Enforcement of Judgment | □ 330 Federal Employers' Liability | □ 368 Asbestos Personnel Injury Product Liability | B □ 640 R.R. & Truck | □ 820 Copyrights | □ 470 Racketeer Influenced and Corrupt Organizations |
| □ 151 Medicare Act | | | B □ 650 Airline Regs | X□ 830 Patent | |
| □ 152 Recovery of Defaulted Student Loans (Excl Veterans) | □ 340 Marine | **PERSONAL PROPERTY** | B □ 660 Occupational Safety/Health | □ 840 Trademark | □ 810 Selective Service |
| | □ 345 Marine Product Liability | □ 370 Other Fraud | B □ 690 Other | **B. SOCIAL SECURITY** | □ 850 Securities/ Commodities/Exchange |
| □ 153 Recovery of Overpayment of Veteran's Benefits | □ 350 Motor Vehicle | □ 371 Truth in Lending | | □ 861 HLA (13958) | □ 875 Customer Challenge 12USC3410 |
| □ 160 Stockholder's Suits | □ 355 Motor Vehicle Product Liability | □ 380 Other Personnel Property Damage | **A. LABOR** | □ 862 Black Lung (923) | □ 891 Agricultural Acts |
| □ 190 Other Contract | □ 360 Other Personal Injury | □ 385 Property Damage Product Liability | □ 710 Fair Labor Standards Act | □ 863 DIWC/DIWW (405(g)) | □ 892 Economic Stabilization Act |
| □ 195 Contract Product Liability | | | □ 720 Labor Management Relations | □ 864 SSID Title XVI | □ 893 Environmental Matters |
| **A. REAL PROPERTY** | **A. CIVIL RIGHTS** | **B PRISONER PETITIONS** | □ 730 Labor Management Reporting & Disclosure Act | □ 865 RSI (405(g)) | □ 894 Energy Allocation Act |
| □ 210 Land Condemnation | □ 441 Voting | B □ 510 Motions to Vacate Sentence | □ 740 Railway Labor Act | **A.FEDERAL TAX SUIT** | □ 895 Freedom of Information Act |
| □ 220 Foreclosure | □ 442 Employment | Habeas Corpus | □ 790 Other Labor Litigation | □ 870 Taxes (US Plaintiff or Defendant) | □ 900 Appeal of Fee Determination Under Equal Access to Justice |
| □ 230 Rent Lease & Ejectment | □ 443 Housing/ Accommodations | B □ 530 General | A □ 791 Employee Ret. Inc. Security Act | □ 871 IRS-Third Party 26 USC 7609 | |
| □ 240 Torts to Land | □ 444 Welfare | A □ 535 Death Penalty | | | □ 950 Constitutionality of State Statutes |
| □ 245 Tort Product Liability | □ 440 Other Civil Rights | B □ 540 Mandamus & Other | | | □ 890 Other Statutory Action A or B |
| □ 290 All Other Real Property | | B □ 550 Civil Rights | | | |
| | | B □ 555 Prison Condition | | | |

| VI. ORIGIN | (PLACE AN X IN ONE BOX ONLY) | | | | | |
|---|---|---|---|---|---|---|
| 1. Original Proceeding | □ 2. Removed From State Court | □ 3. Remanded From Appellate Court | □ 4. Reinstated or Reopened | □ 5. Transferred from another district (specify) | □ 6. Multidistrict Litigation | □ 7. Appeal to District Judge from Magistrate Judgment |

| VII. REQUESTED IN COMPLAINT | □ Check if this is a CLASS ACTION □ UNDER F.R.C.P. 23 | DEMAND $1,000,000⁺ | CHECK YES only if demanded in complaint JURY DEMAND: □X YES   □ NO |
|---|---|---|---|

VIII. RELATED CASE(S) IF ANY   (See Instructions:)   JUDGE _____   DOCKET NO _____

DATE   December 2, 2004

SIGNATURE OF ATTORNEY OF RECORD   _Marc Gottlieb_

For Office Use Only:   Receipt # 532757   Amount 150   Applying IFP _____   Judge _____

253034;1:1

**INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-44**

Authority For Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required b except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Co the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case complete the form as follows:

I.     (a)     Plaintiffs - Defendants. Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b)     County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved).

(c)     Attorneys. Enter firm name, address, telephone number, and attorney or record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.     Jurisdiction. The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction is based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an X in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below: federal question actions take precedence over diversity cases.)

III.     Residence (citizenship) of Principal Parties. This section of the JS-44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.     Cause of Action. Report the civil statute directly related to the cause of action and give a brief description of the cause.

V.     Nature of Suit. Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section IV above, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

VI.     Origin. Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Refiled. (4) Check this box for cases refiled in the district court. Attach copy of order.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate's decision.

VII.     Requested in Complaint. Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.     Related Cases. This section of the JS-44 is used to reference relating pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

Date and Attorney Signature. Date and sign the civil cover sheet.

AO 440 (Rev. 10/2002) Summons in a Civil Case

# UNITED STATES DISTRICT COURT

### Southern District of Florida

Case Number: **04 61703 CIV-MARRA**

MAGISTRATE JUDGE SELTZER

Ventrassist Pty Ltd. and
University of Technology
at Sydney,

Plaintiff

v.

Heartware Inc.

Defendant

## SUMMONS IN A CIVIL CASE

TO: (Name and address of defendant)

Heartware Inc.
3351 Executive Way
Miramar, Florida 33025

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

**Marc J. Gottlieb/ FBN: 0827819
AKERMAN SENTERFITT
350 E. Las Olas Blvd., #1600
Ft Lauderdale, FL 33301
Tel.: 954-463-2700**

an answer to the complaint which is herewith served upon you, within _____ **20** _____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

**Clarence Maddox**

CLERK

DATE _10/31/04_

(BY) DEPUTY CLERK

AO 440 (Rev. 10/2002) Summons in a Civil Case (Reverse)

| RETURN OF SERVICE | | |
|---|---|---|
| Service of the Summons and Complaint was made by me [1] | DATE | |
| NAME OF SERVER (PRINT) | TITLE | |

*Check one box below to indicate appropriate method of service*

G    Served personally upon the defendant.  Place where served: _____

_____

G    Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

Name of person with whom the summons and complaint were left: _____

_____

G    Returned unexecuted: _____

_____

_____

_____

G    Other (*specify*): _____

_____

| STATEMENT OF SERVICE FEES | | |
|---|---|---|
| TRAVEL | SERVICES | TOTAL |

| DECLARATION OF SERVER |
|---|

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____        _____
                         Date                                      Signature of Server

                                                          _____
                                                          Address of Server

(1)        As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.