THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Ventrassist Pty Ltd. and University of
Technology at Sydney,                    :

                      Plaintiffs,    :    Case No. 04-61703-CIV-MARRA

     v.                                  :

HeartWare, Inc.,                         :

                  Defendant.   :

---

## DEFENDANT'S REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

### I.    INTRODUCTION

Defendant's Memorandum of Law in Support of Its Motion to Dismiss Plaintiffs' Complaint pursuant to FRCP 12(b)(1) and 12(b)(6) or in the Alternative for Summary Judgment pursuant to FRCP 12(b) and 56 ("Defendant's Motion to Dismiss") proved that all of Defendant HeartWare's activities are exempt from infringement pursuant to the safe harbor provision of 35 U.S.C. §271(e)(1).  In view of such overwhelming evidence provided by Defendant, Plaintiffs have resorted to making arguments that are based on false premises in its response brief.  Plaintiffs Ventrassist and University of Technology at Sydney ("Plaintiffs") attempt to rely on the future unexecuted plans of Defendant disclosed in the HeartWare Limited Prospectus to argue non-exemption.  The Prospectus, however, does not change the fact that HeartWare cannot infringe as a matter of law.  To the contrary, the incontestable facts are that HeartWare has submitted no data to foreign regulatory agencies, has not commercialized its technology either inside or outside of the United States, is not engaged in general research and is not engaged in device selection.  As the Plaintiffs have failed to show any facts to the contrary, much less raised a genuine issue of material fact with respect to HeartWare's past and current activities, HeartWare is entitled to its Motion to Dismiss and/or Summary Judgment.

### II.    DEFENDANT HAS PROVEN THAT ITS ACTIVITIES ARE EXEMPT

Defendant's Motion to Dismiss demonstrated that HeartWare is not making, using, selling and/or offering for sale products and methods that infringe the patents in suit.  Plaintiffs



have agreed, in part, with Defendant's position and filed an Amended Complaint, eliminating its claims that Defendant HeartWare was selling or offering for sale products infringing the '797 and '883 patents. However, the Amended Complaint does not moot Defendant's Motion to Dismiss and Plaintiffs so stipulated in their Response. Indeed, nothing in Plaintiff's Response, or the Amended Complaint, calls into question HeartWare's entitlement to a safe harbor from 35 U.S.C. §271. Specifically, HeartWare is not "making" or "using" products or methods that infringe the patents in suit because such activities are exempt as provided by 35 U.S.C. §271(e)(1). Thus, the Motion to Dismiss should be granted, or in view of the declarations provided, each of which remain uncontroverted, Defendants are entitled to Summary Judgment.

The evidence and declarations show that HeartWare's activities, since prior to the issuance of either of Plaintiffs' patents, have been for the purpose of developing information concerning HeartWare's left ventricular assist device (LVAD) and miniature left ventricular assist device (MVAD) for submission to the FDA, for eventual approval of the LVAD and MVAD under the Food, Drug and Cosmetic Act (the "FDCA"), 21 U.S.C. §301 *et seq.* and regulations promulgated by the FDA pursuant to the FDCA under 21 C.F.R. (the "Regulations"). Defendants have provided uncontroverted evidence that all of its activities fall under the safe harbor provision of §271(e)(1), i.e., that such activities are solely for uses reasonably related to the development and submission of information under a federal law which regulates the manufacture, use or sale of drugs. As discussed in detail below, Plaintiffs have failed to contradict such a conclusion.

**A.     The LVAD That HeartWare Has Been Developing Since 2001 is the Same Product That Will be Submitted for FDA Approval and Is Exempt.**

HeartWare's LVAD is a highly evolved and carefully developed device, which is surgically implanted in a patient's heart and helps pump the proper amount of blood in order to prolong a patient's life. The basic research for such rotary ventricular assist devices was completed years ago and in part, resulted in patents filed in the 90's including some of which have been assigned to HeartWare (Exhibit 10, ¶ 6). HeartWare's activities since 2001 have not involved basic research for ventricular assist devices (Exhibit 10, ¶ 7). Also, HeartWare has not made, used or sold a ventricular assist device in order to select which type of ventricular assist device to develop (Exhibit 10, ¶ 7). Although HeartWare's LVAD has undergone assessment, testing and refinement since 2001, and will continue to undergo such assessment, testing and refinement in order to develop information to demonstrate an evaluation of the safety and

effectiveness of the device pursuant to the Investigational Device Exemption regulations of the FDA (21 C.F.R. §812.27(b)(2)) (Exhibit 11, ¶ 6), such development could not be described as basic research or an initial selection process (Exhibit 10, ¶ 7). Thus, the LVAD that HeartWare has been developing and refining since 2001 is the same overall product upon which its IDE application to the FDA will be based.

While Plaintiffs may attempt to argue that the making of refinements or modifications in a device is outside the scope of activity that leads to FDA approval, the FDA itself disagrees. "The agency recognizes that during the course of a clinical investigation, modifications to both the device and the clinical protocol will need to be made." (FDA IDE Guidance Memorandum No. D99-1, page 5 attached as Exhibit 12.)  In fact, one of the purposes of the FDA approval process is to make refinements and modifications to the devices in order to develop information to demonstrate an evaluation of the safety and potential effectiveness of the device to comply with the IDE Regulation of the FDA (21 C.F.R. §812.27(b)(2)) (Exhibit 13, ¶ 12).   Further, Plaintiffs' have failed to provide any direct evidence that HeartWare's activities are basic research.

Although Plaintiffs' attempt to characterize HeartWare's activities as being similar to those of Merck and Scripps in *Integra Lifesciences I, Ltd. v. Merck KGaA,* 331 F.3d 850 (Fed. Cir. 2003), and to enlarge the holding of that case in order to argue that HeartWare's activities are not exempt, such attempts by Plaintiffs fail on many grounds.  It is not plausible to construe HeartWare's activities as the general research that Merck was undertaking in order to determine which drug it would choose and to later develop for FDA approval.  As the declarations provided in support of HeartWare's initial Motion to Dismiss demonstrate, HeartWare's activities have been narrowly focused on one particular kind of LVAD for eventual FDA approval and such activities cannot be characterized as experimenting with different types of ventricular assist devices or screening different types of ventricular assist devices to see which one may be eventually submitted to the FDA for approval.  (Exhibit 3, ¶¶10, 21 and Exhibit 5, ¶ 18). Further, even a broad reading of the CAFC's holding in *Integra* (which has been widely criticized[1]) fails to ensnare HeartWare's activities in a non-exempt status.  As has been shown by

---

[1] In its amicus brief for U.S. Supreme Court in *Merck KGAA v. Integra Lifesciences I, Ltd., et al.* (Docket No. 03-1237, 2004 WL 285124) the United States, including the Acting Associate

the declarations of two former FDA officials and is uncontroverted by Plaintiffs, HeartWare's activities surrounding its LVAD were solely for uses reasonably related to the development and submission of information to the FDA under the FDCA and the Regulations and are exempt under 35 U.S.C. §271(e)(1) (Exhibit 4, ¶ 30 and Exhibit 5, ¶ 18).

Defendant's submission of its pre-IDE package to the FDA on February 9, 2004, clearly shows that HeartWare's activities are solely for uses reasonably related to the development and submission of information to the FDA (Exhibit 11, ¶ 7 and Exhibit 13, ¶ 13). Plaintiffs' attempt to downplay the formal processes of the FDA, including the pre-IDE submission process, contradicts the regulations of the FDA (Exhibit 13, ¶ 15). The pre-IDE process was formalized by the FDA under the "Guidance on IDE Policies and Procedures" issued January 20, 1998 (Attachment A to Exhibit 13). The policy states, "sponsors are encouraged to submit pre-IDE submissions to the ODE [Office of Device Evaluation] reviewing divisions while the sponsor is preparing a formal IDE submission..." (Page 1-2) The procedures provide for pre-IDE meetings including "formal guidance" meetings that may lead to agreements regarding parameters of an investigational plan (including clinical protocol) to be "put in writing and made part of the administrative record by the FDA." *Id.* The attached declarations of two former FDA officials, Ms. Piasecki and Ms. Shanker, state that the pre-IDE process is very important for the FDA as well as the sponsor, in order to facilitate the development of information necessary for an IDE application. (Exhibit 11, ¶ 8, Exhibit 13, ¶ 14). The declaration of Plaintiffs' employee Theisz is incorrect with respect to her characterization of the pre-IDE process (Exhibit 13, ¶ 16). As discussed above, a pre-IDE procedure <u>can</u> lead to formal reporting requirements by the FDA to obtain FDA approval (Exhibit 13, ¶ 15). A company's submission of a pre-IDE package to the FDA supports a finding of an exemption under 271(e)(1). *Nexell Therapeutics, Inc. v. AmCell Corp.*, 143 F. Supp. 2d 407 (D. Del. 2001).

**B.     HeartWare's MVAD is Also Being Developed for FDA Approval**

HeartWare has assembled a single precursory prototype of a miniature left ventricular assist device (MVAD) (Exhibit 10, ¶ 8). The MVAD, however, is an evolution of the LVAD

---

General Counsel of the Food and Drug Division, states, "The decision of the Court of Appeals reflects an incorrect view of the law, and...is inconsistent with the text of the FDA exemption, reflects a mistaken and unduly narrow view of the types of information relevant to the FDA's two-step process."

and builds on its development (Exhibit 10, ¶ 10).  HeartWare has undertaken many months of development and analysis of the MVAD by making drawings, calculations and computer models -- none of which could be considered infringing activity (even if Plaintiffs had a patent that covered its features) (Exhibit 10, ¶ 9).  Many of the results obtained from preparing the LVAD for FDA approval have been incorporated in the design of the MVAD, so that it can be more quickly developed for FDA approval (Exhibit 10, ¶ 10).  The MVAD is similar in many respects to the LVAD (Exhibit 10, ¶ 11).  Similarly, the MVAD activities, like the LVAD, are exempt under the safe harbor provision of 271(e)(1), because they are solely for uses reasonably related to the development and submission of information to the FDA (Exhibit 10, ¶ 18).

Furthermore, even if the MVAD were to be considered at an earlier stage in development than the LVAD, it still fails to come under the *Integra* ruling and is exempt.  HeartWare's activities surrounding the MVAD are not general or basic research (Exhibit 10, ¶ 7).  Such a type of ventricular assist device has been highly developed (Exhibit 10, ¶ 12).  Further work on the MVAD will involve developing its performance in order to demonstrate an evaluation of the safety and effectiveness of the device (Exhibit 10, ¶ 12).  Therefore, while HeartWare's activities with regard to its MVAD are *de minimus*, such activities are also exempt, as they are solely for uses reasonably related to development and submission of information to the FDA under the FDCA and the Regulations (Exhibit 10, ¶ 18).

### C.    HeartWare's PedVAD is Not in Existence

Plaintiffs also question another HeartWare product designated a "PedVAD," or pediatric left ventricular assist device.  Despite Plaintiffs' attempts to construe the descriptions in the HeartWare Limited Prospectus of future planned activities, as descriptions of past or ongoing activities; HeartWare has never made, used or sold a PedVAD (Exhibit 10, ¶ 13).  There is no actual PedVAD product or even a prototype in existence (Exhibit 10, ¶ 14).

### III.   PLAINTIFFS HAVE NOT SHOWN ACTUAL INFRINGING AND NON-EXEMPT ACTIVITIES BY DEFENDANT HEARTWARE

### A.    Future Contemplated Non-exempt Activities Are Irrelevant

Plaintiffs' reliance on the future contemplated plans disclosed in the HeartWare Limited Prospectus to argue non-exemption ignores the wording and spirit of 271(e)(1).  The exemption under 271(e)(1) is concerned with actual "uses" and states in pertinent part:

> "It shall not be an act of patent infringement to make, use, offer to sell or sell...a patented invention...solely for **uses** reasonably related to the development and

submission of information under a federal law which regulates the manufacture, use, or sell of drugs or veterinary biological products." (emphases added)

Plaintiffs are attempting to replace the phrase "solely for uses" with the phrase "solely for purposes." However, the Federal Circuit has held that the statute "does not look to the underlying purposes or attendant consequences of the activity." *Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1030 (Fed. Cir. 1997). Plaintiffs also ignore prior case law which has held that "intent or alternative uses are irrelevant to the inquiry" under 271(e)(1). *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 3 F. Supp. 2d 104, 107-108 (D. Mass. 1998). Thus, Plaintiffs' arguments regarding the future and planned, but not executed, activities described in the Prospectus of HeartWare Limited are irrelevant. In any event, it is expected that many of these future planned activities, if performed, would be exempt under 271(e)(1). Nevertheless, the activities complained of by Plaintiffs have not occurred, and therefore cannot be a basis for denying HeartWare its exempt status (Exhibit 10, ¶¶ 8, 13, 14).

> 1.   No Foreign Regulatory Activity

HeartWare has not undertaken any foreign regulatory submissions (Exhibit 10, ¶ 15, Exhibit 11, ¶ 9). Although HeartWare is planning to make submissions to foreign regulatory agencies in Australia and Europe in the future, no such submissions have been made to date. (Exhibit 10, ¶ 15 and Exhibit 11, 9¶). Plaintiffs quote the Prospectus which states "it is expected that the funds raised **will** enable HeartWare to commence HVAD clinical trials in Australia and Europe, to initiate HVAD trials in the U.S., and to continue research and development of the MVAD." (emphasis added) (Pl.'s Resp. Br. at 5). This statement is obviously forward looking. Plaintiffs' cannot premise its allegations of infringement on contemplated activities. Plaintiffs' allegations of infringement must be premised on "uses" that have already occurred.

Plaintiffs would like the Court to believe that, because HeartWare is planning on applying for approval to foreign regulatory agencies, it proves that HeartWare's activities cannot also be for FDA approval in the United States. Plaintiffs further try to confuse the issues by arguing that the order in which HeartWare will be applying for regulatory approval somehow proves that HeartWare's activities cannot also be for FDA approval. *Id.* at 9. Plaintiffs' position is not supported by the facts or the law.

HeartWare has provided declarations of independent FDA officials attached as Exhibits 11 and 13 to clarify this matter. HeartWare will be submitting parts of the same test data to each

6

of the regulatory agencies in the United States, Europe and Australia (Exhibit 11, ¶ 11). HeartWare intends to conduct one reliability test for its LVAD. The Data from that single test will be used to support applications for approval in the U.S., Australia and/or Europe[2] (Exhibit 11, ¶ 11). This is the common procedure when applying for regulatory approval in multiple countries around the world (Exhibit 13, ¶ 21). Therefore, it is clear that HeartWare is developing such information to be used to apply for FDA approval. It is irrelevant that such information will also be used for foreign regulatory approval.

Plaintiffs' erroneously rely on *NeoRx Corp. v. Immunomedics*, 877 F. Supp. 202 (D. NJ 1994), to support its position that preparing for foreign regulatory approval deprives a Defendant of exemption (Pl.'s Resp. Br. at 9). The Court actually held otherwise. "Immunomedics also ran clinical trials overseas with an eye towards obtaining regulatory approval in those countries. [*Id.*] This commercial motivation does not necessarily deprive Defendant of the §271(e)(1) exemption." *Id.* at 207. Thus, it is clear that HeartWare's stated intent to apply for foreign regulatory approval sometime in the future, is not relevant to HeartWare's current activities and does not preclude HeartWare's activities from being solely for uses reasonably related to the development and submission of information to the FDA, as has been supported by the declarations submitted by HeartWare in its initial motion and attached hereto (Exhibit 3, ¶ 24, Exhibit 4, ¶ 30, Exhibit 5, ¶ 18, Exhibit 10, ¶ 18).

      2.    HeartWare Has Not Undertaken Any Commercialization That Would Preclude Its Exemption

Again, Plaintiffs incorrectly rely on the future statements in the Prospectus of HeartWare Limited with respect to its plans for commercial sales, to support its arguments of non-exemption (Pl.'s Resp. Br. at 14). First, sales of an LVAD by HeartWare in Europe or Australia would not be considered infringing activity under a U.S. patent. Second, HeartWare has not undertaken any such activities (Exhibit 10, ¶¶ 15, 17). Just as commercial sales would be illegal in the United States prior to FDA approval, commercial sales would also be illegal in Europe or

---

[2] Even though the HeartWare Limited Prospectus states that results from overseas regulatory agencies may not be usable for the U.S. FDA approval process in the Section entitled "Risk Factors," this is a hypothetical situation and the test under 271(e) is not whether the information is actually submitted to the FDA, but merely whether such uses are "solely for uses reasonably related to the development and submission of information to the FDA."

Australia, prior to approval by their regulatory agencies.   Plaintiffs' cannot premise its allegations of infringement on planned activities.  The allegations of infringement must be based on "uses" that occurred at the time of or earlier than the filing of the Plaintiffs' Complaint. HeartWare's planned commercialization of its LVAD in Europe or Australia cannot be the basis for allegations of infringement under a U.S. patent.

In affirming the grant of summary judgment that the defendants' activities were either non-infringing or exempt under 35 U.S.C.§ 271(e)(1), the Federal Circuit stated:

> Making arrangements to have a device manufactured overseas or making arrangements to have it imported into a foreign country is neither an infringing "making", "using" or "selling" of the invention within the United States.

*Chartex International v. M.D. Personal Products Corp.*, 1993 U.S. App. LEXIS 20560, *10 (Fed. Cir. 1993) (unpublished).

As well, such planned commercialization in Europe or Australia does not negate the fact that HeartWare's activities surrounding its LVAD have been solely for uses reasonably related to the development and submission of information to the FDA.  In *Teletronics Pacing Systems, Inc. v. Ventritex, Inc.*, the Federal Circuit adopted the District Courts framing of the relevant inquiry for determining an exemption under 271(e)(1) from *Intermedics, Inc. v. Ventritex, Inc.* as:

> "Would it have been reasonable, objectively, for a party in Defendant's situation to believe that there was a decent prospect that the 'use' in question would contribute (relatively directly) to the generation of kinds of information that was likely to be relevant in the processes by which the FDA would decide whether to approve the product?   If the answer is yes, it should not matter that other reasonable persons might have concluded that FDA approval could be secured even without the information in question."

775 F. Supp. 1269, 1280 (N.D. Cal. 1991).  In view of the uncontroverted declarations provided by HeartWare in this Motion and the original Motion to Dismiss (Exhibits 3, 4, 5, 10, *supra*), it is clear that the answer to the question of exemption, as framed by *Intermedics*, is YES.  And the answer remains YES, irregardless of whether HeartWare has plans to commercialize or apply for regulatory approval in foreign countries.

Plaintiffs have misconstrued the meaning of "solely for uses reasonably related" of Section 271(e)(1).   The court in *Amgen, supra* found that "[t]he phrase 'solely for uses reasonably related' is not equivalent to the phrase 'use is solely for purposes reasonably related.' The latter reflects a more restrictive view of permissible activities under the statute.  Uses, such

8

as animal testing, human clinical trials, or chemical composition analysis, may be related to FDA approval, and yet be conducted for *purposes* other than, or in addition to, obtaining FDA approval." *Id.* at 108. "[T]he word 'solely' is not rendered superfluous . . . [r]ather, it mandates that the making, using, or selling of the patented invention cannot be for uses that are *not* reasonably related to FDA approval; that is, uses which could not reasonably be expected to lead to the production of information that could be used to satisfy FDA reporting requirements." *Id.* at Fn. 3. Thus, the use must be reasonably related to FDA approval, though, as the *Amgen* court found, the use need not be for the exclusive purpose of FDA approval.

Plaintiffs' Brief states, "Plaintiffs have been unable to locate any direct evidence that Defendant actually shipped product overseas." (Pl.'s Resp. Br. at 15, fn 8). In fact, Plaintiffs have not provided any direct evidence of activities that would prove non-exemption under 271(e)(1). All of Plaintiffs' proof is circumstantial evidence based on the Prospectus of HeartWare Limited --evidence of future plans only; not any actual activities of HeartWare, Inc.

3.     Fundraising Activities Of HeartWare Are Exempt

The Federal Circuit has recognized "the need of competitors to raise funds for developing and testing competing products, and for preparing to enter a market once controlling patents had expired." *Teletronics Pacing Systems, Inc. v. Ventritex, Inc.*, 982 F.2d 51520, 1525 (Fed. Cir. 1992.) The activities found exempt in the *Ventritex* case included mailing a private placement memorandum to potential investors that described the size and progress of its clinical trials, for the purpose of raising funds for an IPO. Thus, neither HeartWare's IPO in Australia nor its Prospectus for the IPO can be considered a "use" that is an infringement of a U.S. patent, nor do such activities somehow contradict the fact that HeartWare has been developing its LVAD and MVAD solely for uses reasonably related to the development and submission of information to the FDA (Exhibit 10, ¶ 18). "[A] product manufacturer does not lose its FDA exemption by engaging in non-infringing activities other than generating FDA data." *Chartex International*, 1993 U.S. App. LEXIS 20560, *7 (Fed. Cir. 1993) (unpublished). While Plaintiffs attempt to rely on the Prospectus and the future plans disclosed in the Prospectus to argue that HeartWare's activities are non-exempt, Plaintiffs fail to provide any support that HeartWare's <u>actual</u> activities are not exempt.

**B.    Good Laboratory Practices (GLP) is Not the Standard for Exemption and is Not Required By the FDA**

Ignoring the FDA regulations, Plaintiffs go to some length to try to develop an argument that somehow HeartWare's activities are not exempt under 271(e)(1), because some of its tests may not comply with good laboratory practices (GLP) and that such tests cannot be submitted to the FDA (Pl.'s Resp. Br. at 12). First, the FDA will accept non-GLP test data. Second, the test under 271(e)(1) is <u>not</u> whether information is being prepared to be directly submitted to the FDA. Rather the statute requires activities that are solely for uses **reasonably related** to the development and submission of information to the FDA (emphasis added).

Plaintiffs' desperation to make a case that HeartWare's activities are non-exempt is exhibited by two declarations that make incorrect statements regarding the FDA's regulations concerning non-GLP tests. Plaintiffs have used two of its employees with no experience handling IDE applications with the U.S. FDA to make incorrect statements regarding non-GLP tests in order to salvage their non-exemption argument (Exhibit 13, ¶ 19). The declarations of Ms. Thiesz and Mr. Lee show that they have no experience submitting IDE or PMA applications to the United States FDA (Exhibit 13, ¶ 15). It is not surprising that both of these Ventrassist employees failed to be aware of the IDE Regulations and were incorrect when they stated that the submission of non-GLP data to the FDA is prohibited for an IDE application. To the contrary, 21 C.F.R. §812.27(d)(3) states as follows:

> If information on non-clinical laboratory studies is provided, a statement that all such studies have been conducted in compliance with applicable requirements in the good laboratory practice regulations in part 58, **or if any such study was not conducted in compliance with such regulations, a brief statement of the reason for the non-compliance.** Failure or inability to comply with this requirement does not justify failure to provide information on a relevant non-clinical test study (emphasis added).

21 C.F.R. §812.20(b) states in pertinent part as follows:

> An IDE application shall include, in the following order: 1) the name and address of the sponsor, 2) a complete report of the prior investigations of the device...

Thus, while the FDA regulations require a complete report of the prior investigations of a device, regulations allow for non-GLP data to be submitted if there is a "brief statement of the reasons for the non-compliance." (Exhibit 13, ¶ 17) In the attached declaration of Ms. Rhona Shanker, a former FDA official who has overseen hundreds of IDE applications and has over 24

10

years of experience in the field of regulatory compliance of medical devices with the FDA (Exhibit 13, ¶¶ 6-8), Ms. Shanker states that it is common for the FDA to accept non-GLP data (Exhibit 13, ¶ 18). Plaintiffs' basic premise that HeartWare's non-GLP data cannot be submitted to the FDA, is simply wrong.

Again, Plaintiffs are hypothesizing about what may occur in the future, instead of identifying facts that have occurred, to support its allegations of actual infringement. HeartWare is doing its best to develop its LVAD for approval by the FDA. Whether it submits non-GLP data or submits GLP data to the FDA remains to be seen, at the time it is actually submitted to the FDA. However, "intent or alternative uses are irrelevant to the inquiry." *Amgen* at 107.

Even assuming *arguendo* that HeartWare had only developed non-GLP data to date, but was going to be conducting new GLP tests and submitting such data to the FDA, the earlier tests are still exempt under 271(e)(1). The test for exemption is not the development of data that will be submitted to the FDA. Rather, the test under 271(e)(1) is whether there was a decent prospect that the "use" in question would contribute (relatively directly) to the generation of kinds of information that was likely to be relevant and the processes by which the FDA would decide whether to approve the product." *Teletronics Pacing Sys.*, 775 F. Supp. at 1280. Even if non-GLP tests were conducted by HeartWare, such tests would still contribute to the generation of the kinds of information that is likely to be relevant in the process by which the FDA would decide to approve the product (Exhibit 11, ¶ 12, Exhibit, 13 ¶ 20). In other words, it is highly relevant to running a GLP test and learning how to properly prepare for that GLP test by running non-GLP tests (Exhibit 11, ¶ 12, Exhibit 13, ¶ 20). Therefore, such non-GLP tests contribute relatively directly to the generation of information that will be submitted to the FDA and HeartWare's activities are exempt under 271(e)(1) (Exhibit 11, ¶ 12, Exhibit 13, ¶ 20).

**IV.     PLAINTIFFS HAVE NOT ESTABLISHED THAT GENUINE ISSUES OF MATERIAL FACT EXIST REGARDING DEFENDANT'S EXEMPT ACTIVITIES AND DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT**

**A.     Defendant's Declarations can be Relied on for the Summary Judgment Motion**

If the Court chooses, pursuant to Rule 12(b), to convert Defendant's Motion to Dismiss to a Motion for Summary Judgment under Rule 56, it can rely on extrinsic evidence such as the declarations provided by Defendant HeartWare. The facts provided by these declarations which support the 271(e)(1) exemption for HeartWare's activities have been uncontroverted by

Plaintiffs.  Two former FDA officials have sworn that all of HeartWare's activities are solely for uses reasonably related to the development and submission of information to the FDA under the FDCA and the regulations (see Exhibits 4 and 5 provided with Defendant's original Motion to Dismiss).  Defendant's have also provided the declarations of its Chief Technology Officer, Jeffrey LaRose, that provides a description of its LVAD and MVAD and its activities to develop the LVAD and MVAD for FDA approval (see Exhibit 3 provided with Defendan'ts original Motion to Dismiss and Exhibit 10 attached hereto).  Plaintiffs' have failed to show that any of these actual activities of HeartWare are non-exempt.  Therefore, HeartWare has met its burden to demonstrate the basis for its Motion for Summary Judgment and has shown an absence of any genuine issue of material fact.  *Hearsten v. Gainesville Sun Publishing Company*, 9 F.3d 913, 918 (11th Cir. 1993).  Based on the showings made by HeartWare, the burden has shifted to Plaintiffs to establish that there exists genuine issues of material facts.  *Id.*  Ventrassist has failed to show that genuine issues of material fact exist that are relevant to the question of exemption under 271(e)(1).

**B.     In the Absence of Genuine Issues of Material Fact, Defendant Is Entitled to Summary Judgment**

1.     Issues Raised by Plaintiffs Are Not Relevant.

Issues raised by Plaintiffs in their brief are not relevant to the question of 271(e)(1) exemption.  Such issues are "red herrings."  As discussed above, HeartWare's future activities concerning foreign regulatory agencies is not relevant to the question of exemption under 271(e)(1).  The only relevant inquiry is whether HeartWare's actual activities undertaken prior to the filing of the complaint are solely for uses reasonably related to the development and submission of information to the FDA.  Future activities with regard to foreign regulatory agencies and whether HeartWare's testing complies with good laboratory practices (GLP) are not relevant to this inquiry.  Therefore, with respect to the actual activities of HeartWare and whether they are solely for uses reasonably related to the development and submission of information to the FDA, Plaintiffs' have failed to point to any actual non-exempt activity or establish that genuine issues of material facts exist with respect to such activity.  Therefore, Defendant HeartWare is entitled to summary judgment because all of HeartWare's activities are exempt under 271(e)(1) and there is no infringement under 35 U.S.C. §271(a).

      2.      Issues Raised by Plaintiffs with Regard to the Prospectus Do Not Contradict Defendant's Declarations

Plaintiffs' make serious allegations concerning alleged contradictions concerning the statements made in the HeartWare Limited Prospectus and Defendant's Declaration (Pl.'s Resp. Br. at 6). However, Plaintiffs fail to identify a particular statement that is contradicted. Despite providing a seven page Declaration of Mr. Kriederman providing a Hornbook of Australian Securities Law, Plaintiffs have not identified an actual inconsistency. For example, the statements in the prospectus concerning foreign regulatory approval are not inconsistent with Defendant's representations that its activities are also related to obtaining FDA approval, as has been explained above. All statements made in the Prospectus and the declarations in support of this motion are entirely consistent.

## V.    DEFENDANT IS ENTITLED TO DISMISSAL OF THE AMENDED COMPLAINT UNDER FRCP 12(b)(1) AND 12(b)(6)

Defendants have moved to dismiss the Complaint for lack of subject matter jurisdiction and for failure to sate a claim under FRCP 12(b)(1) and 12(b)(6). On a Motion to Dismiss that challenges jurisdiction pursuant to Rule 12(b)(1), the Court may look beyond the pleadings. *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980). As shown in the declarations attached to Defendant's original Motion to Dismiss and declarations attached hereto, it is clear that Plaintiffs' have not properly plead infringement under the patent statute, because HeartWare's activities are exempt under §271(e)(1). These declarations have established that HeartWare's activities are solely for uses reasonably related to the development and submission of information to the FDA under the FDCA and Regulations and such activities are exempt under §271(e)(1). Because HeartWare has shown that it is entitled to the exemption under 271(e)(1), it is a "certainty that Plaintiffs would be entitled to no relief under any state of acts which could be proven in support of its claim." *Phonometrics Inc. v. Hospitality Franchise System Inc. et al.*, 203 F.3d 790 (Fed. Cir. 2000).

Plaintiffs' Amended Complaint still fails to address the legal deficiency of its pleading. By amending paragraph 9 of the Complaint to allege that HeartWare's activities "are not exempt under 35 U.S.C. § 271(e) or otherwise," Plaintiffs have used an illusory tactic that is a worthless attempt to fix their pleading. Plaintiffs have failed to positively recite facts that indicate non-exempt activities of Defendant. As well, by reciting activities that as a matter of law cannot be infringing activities under a U.S. Patent and are exempt, e.g., foreign fundraising, foreign

commercialization and foreign regulatory approval, Plaintiffs' have failed to cure the deficiencies in its Complaint. Again, Plaintiffs have done no more than merely labeled its claim. See, *Delmonte Fresh Produce Company v. Dole Food Company, Inc.*, 136 F. Supp. 2d 1271, 1283 (S.D. Fla. 2001). Thus, Plaintiffs' have failed to properly plead infringement because they have not provided anything to show that HeartWare's activities are not exempt under §271(e)(1), have failed to state a claim and this Court lacks subject matter jurisdiction over the Amended Complaint. Therefore, the Amended Complaint should be dismissed pursuant to Rule 12(b)(1) and 12(b)(6).

## VI.    CONCLUSION

Plaintiffs' filing of its Amended Complaint (while supporting Defendant's position that it was initially filed in bad faith without proper investigation) is an attempt to improperly force HeartWare to negotiate a patent cross license. However, the Amended Complaint still fails to overcome the clear exemption that is afforded HeartWare under 271(e)(1). Plaintiffs' response brief fails to contradict any of the facts which undeniably support HeartWare's exemption. Therefore, the Complaint should be dismissed for lack of subject matter jurisdiction under 12(b)(1) and failure to state a claim under Rule 12(b)(6). In the alternative, HeartWare should be granted summary judgment on all claims in the Complaint.

Respectfully submitted,

Co-Counsel
George Gerstman, Esq.
David L. Newman, Esq.
SEYFARTH SHAW LLP
55 East Monroe Street
Suite 4200
Chicago, IL 60603

FELDMAN GALE
Miami Center, Suite 1920
201 S Biscayne Blvd.
Miami FL 33131
Tel: (305) 358-5001
Fax: (305) 358-3309

By: _____
      James A. Gale
      Florida Bar No. 371726
      jgale@FeldmanGale.com
      Gregory L. Hillyer
      Florida Bar No. 682489
      ghillyer@FeldmanGale.com

14

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing served by Federal Express on this 4th day of April, 2005 to: Jeffrey I. Kaplan, Esq., Kaplan & Gilman, L.L.P., 900 Route 9 North, Woodbridge, NJ 07095 and by U.S. Mail to: Marc J. Gottlieb, Esq. and Joseph W. Bain Esq., Akerman Senterfitt, Las Olas Centre II, Suite 1600, 350 East Las Olas Blvd., Ft. Lauderdale, FL 33301.

CH1 10879306.1

# EXHIBIT 12

**FDA  U.S. Food and Drug Administration**  Department of Health and Human Services

### CENTER FOR DEVICES AND RADIOLOGICAL HEALTH

FDA Home Page | CDRH Home Page | Search | CDRH A-Z Index | Contact CDRH

# Pre-IDE Program: Issues and Answers

 See Related Information

# March 25, 1999 (D99-1)

### IDE Guidance Memorandum #D99-1

Deputy Director for Science and Regulatory Policy
Office of Device Evaluation (HFZ-400)

**Pre-IDE Program: Issues and Answers**

ODE Review Staff

### Purpose

This memorandum presents a discussion of issues and answers on the Pre-IDE program, as set forth in Blue Book Memorandum D95-1, entitled Goals and Initiatives for the IDE Program issued on July 12, 1995.

This memorandum reviews the intent of the Pre-IDE Program and outlines several cases for which a pre-IDE may be especially useful as opposed to a few cases where it may not be as helpful. The procedures for processing and reviewing this type of pre-submission are also revisited.

**Effective Date:** March 25, 1999


Philip J. Phillips


## MEMORANDUM


**DATE: March 25, 1999**

FROM: Deputy Director for Science and Regulatory Policy, ODE

TO: ODE Staff

SUBJECT: Pre-IDE Program: Issues and Answers


## I. Introduction

In Blue Book Memorandum #D95-1 (http://www.fda.gov/cdrh/d951.html),
the Pre-IDE Program was presented as a way for sponsors of
investigational device exemptions (IDE) applications to be able to
submit preliminary information for comment by the Office of Device
Evaluation (ODE) before submitting the formal IDE application. Under
this program, sponsors could elect to submit those sections of the
IDE application (e.g., clinical protocol design, pre-clinical
testing, etc) for which they wished to obtain FDA guidance, while
preparing the remainder of the IDE application. It was anticipated
that this program would allow ODE staff to provide early input to the
device industry on specific aspects of the IDE application before the
document was officially submitted while at the same time providing
FDA staff with a "heads-up" on the investigational technology and/or
clinical protocol.

Since the pre-IDE Program policy was issued in 1995, ODE has received
and reviewed approximately 200 pre-IDEs per year. Although this
program has been quite successful, issues have arisen that warrant
further discussion. Questions such as when a pre-IDE is appropriate
versus when the original IDE application should be submitted as well
as what types of information should be submitted in a pre-IDE have
come forward. In addition, ODE has received complaints from the
device industry indicating that the pre-IDE process, in some
instances, was so burdensome and time consuming as to jeopardize
future participation in the Program. Other sponsors felt as if they
were "locked' into the pre-IDE Program and could not submit the
formal IDE application until all of the issues raised by the Agency
were resolved. Therefore, in this memorandum, I would like to review
the intent of the Program and outline several cases for which a pre-
IDE may be especially useful as opposed to a few cases where it may
not be as helpful. The procedures for processing and reviewing this
type of pre-submission are also revisited.

## II. Pre-IDE Program: What It Is and What It Is Not

To help clarify the intent of the Pre-IDE Program, a few key
principles should be kept in mind. These are identified below:

  1. First and foremost it should be stressed that the pre-IDE Program

was primarily designed to benefit the IDE sponsor. By allowing the sponsor to obtain early Agency input on selected (by the sponsor) sections of the IDE application, it was hoped that the initiation of clinical trials would be facilitated.

2. In this same vein, it should be fully recognized that IDE sponsors have the option of submitting a pre-IDE; that is, pre-IDEs are never a prerequisite for an IDE.

3. The pre-IDE Program should be not be confused with the Early Collaboration or Determination provisions of sections 520 (g)(7) and 513(a)(3)(D), respectively, of the Food and Drug Administration Modernization Act of 1997 (http://www.fda.gov/cdrh/modact/earlymtg.pdf). Comments provided through the pre-IDE process are intended as informal input and are not in any way binding on the Agency or the sponsor as opposed to the new statutory provisions which have binding elements.

   It should also be noted that the pre-IDE Program was not intended to be a modular review program for IDE applications. That is, sponsors should recognize that even though the Agency may have already reviewed certain sections of an IDE through the pre-IDE process, this does not guarantee approval of the IDE or that additional questions may not arise during review of the formal IDE application.

4. The pre-IDE Program is not an in-depth review process. The Program was intended as a way for sponsors to obtain preliminary comments on their bench/animal testing and/or clinical protocol in a timely manner. It was not intended to be the detailed, comprehensive review that is conducted on an actual IDE application.

   In addition to the above, it should be emphasized that the pre-IDE Program is not a mechanism for sponsors to obtain advanced review of their pre-clinical data. Once an IDE sponsor has progressed to the point of actually collecting bench or animal data, the formal IDE application should be submitted rather than a pre-IDE.

5. The pre-IDE process was not meant to be burdensome to either the sponsor or the Agency. As discussed in more detail later in this memorandum, if IDE sponsors clearly identify those aspects on which they would like ODE reviewers to focus and ODE reviewers follow the established review procedures, the process should not be overly burdensome to either party.

6. The Pre-IDE process is not a way to identify and resolve disputes regarding the most appropriate bench/animal testing and/or

clinical protocol design. Comment on pre-submissions is provided primarily by ODE review staff, not management. Thus, if IDE sponsors disagree with the advice provided through this process, resolution should be sought by submission of the formal IDE as it is only through this type of application that an official Agency determination is made.

[II. **Pre-IDE Program: When is It Appropriate?**

Although the Pre-IDE Program is a way for IDE sponsors to obtain early, informal input on an aspect of a future IDE application, there are circumstances for which submission of this type of application are more useful than others. Those situations for which a pre-IDE may be particularly useful are discussed below.Non-Significant Risk Studies

As stipulated in 21 CFR 812, non-significant risk (NSR) studies do not need FDA's approval to be conducted. For this reason, ODE is generally not involved in the design of the study or the development of the clinical protocol. For this type of study, however, a sponsor may choose to submit a pre-IDE to help identify deficiencies that could preclude approval of a future marketing application. In this case, the pre-IDE application could consist of the proposed study design, clinical protocol, and/or statistical plan, thus allowing ODE staff an opportunity to provide comment on these important factors before the study is conducted.

### *On-going Pre-clinical Testing*

Pre-IDEs may also be useful when the IDE sponsor is still conducting bench/animal testing and would like Agency feedback on a clinical protocol. This pre-IDE scenario may be particularly helpful to the sponsor as the informal review could be performed while the pre-clinical testing is being conducted and thus the total preparation time for the IDE application would not be extended.

### *During Development of the Clinical Protocol*

IDE sponsors may request guidance on the type of bench/animal testing before it is conducted to increase the likelihood that the testing will be adequate to support initiation of the clinical investigation. As in the previous case, advice on this issue could be obtained while the sponsor is developing their clinical protocol, so that submission of the formal IDE is not delayed.

### IV. **Pre-IDE Program: When Is It Not Appropriate?**

In contrast to the above situations in which a pre-IDE would tend to be quite helpful to IDE sponsors, there are some circumstances for

which such submissions may not be as useful. These are discussed below.

### The IDE Application is Complete

Over the last few years, ODE has received some pre-IDEs for essentially complete IDE applications with an indication that the sponsor is ready to begin their clinical trial. This type of pre-IDE is not the best use of the sponsor's or the Agency's time and resources. Instead of delaying submission of the original IDE application, the sponsor should submit their formal IDE application.

### The Sponsor is Committed to a Certain Testing and/or Clinical Protocol

Similarly, if an IDE sponsor believes that the most appropriate bench/animal testing and/or clinical protocol has been developed and is committed to it, the sponsor should submit the formal IDE application. Once a sponsor has reached this point in the process, submission of a pre-IDE serves little, if any, useful purpose.

*Device Design, Indications for Use, and/or Study Design Are Not Well Characterized*

Contrary to the situations described above in which IDE sponsors have submitted pre-IDEs too late in the process, ODE has also received pre-IDEs too early in the device development process. The Agency recognizes that during the course of a clinical investigation, modifications to both the device and the clinical protocol will need to be made. Before advice on the most appropriate type of pre-clinical testing needed for initiation of the trial can be provided, however, the device design and the indications for use must be fairly well developed. Similarly, if the sponsor is looking for help on the study design or clinical protocol but has not yet formulated the basics (i.e., decided upon the type of control and identified the primary and secondary endpoints), it will be difficult for ODE staff to provide meaningful comment. Therefore, it is recommended that IDE sponsors develop these sections of the IDE as much as possible before the pre-IDE is submitted.

### V. Pre-IDE Program: Procedures

### Sponsor Responsibilities

As discussed above, there are several situations for which submission of a pre-IDE is especially useful, such as when the sponsor is working on one part of the application and would like an informal review on another section. Comment on NSR studies may also be obtained through the Pre-IDE Program. Since pre-IDEs may be submitted

for a variety of reasons, the IDE sponsor should:

1. Clearly state the reason for the submission and
2. Identify those areas on which the sponsor would like the
   Agency to focus.

For example, a sponsor may state that he/she is seeking input on the
most appropriate animal model for their investigational device and
ask that the Agency provide comment on their proposed model,
endpoints, and follow-up for this testing. Alternatively, a sponsor
could submit their proposed clinical protocol and identify issues
such as the primary/secondary endpoints, follow-up, and control
treatment as those areas for which advice is requested.

### FDA Responsibilities

In Attachment A, Procedures for Pre-IDE Meetings and Submission, of
Blue Book #D95-1, procedures were established to address the
processing and review of pre-IDEs. These procedures are still in
effect and should be reviewed by ODE staff. Reviewers should note,
however, that since that memorandum was issued, a pre-IDE database
has been developed. Therefore, all pre-IDEs should now be logged into
this database and assigned a pre-IDE number beginning with the letter
"I" by the Document Mail Center (DMC). Upon log-in, a 60 day review
period will automatically be calculated and added to the tracking
sheet.

As discussed in the Blue Book Memorandum, comment on the pre-IDE
submission may be provided via letter, telephone conferencing, face-
to-face meeting, or facsimile. To facilitate both the expeditious
review of and response to these applications, the Agency encourages
communication between ODE staff and the IDE sponsor in whatever
manner allows the best resolution of the issues. It should be
recognized that this will most likely involve more than one method of
communication. For example, ODE staff may discuss the submission with
the pre-IDE sponsor during a conference call but should still follow-
up with either minutes of the meeting or written comments on the pre-
IDE.

Upon log-out of the document, ODE staff is reminded that the
application cannot be officially logged out without completion of the
tracking sheet, including an indication of how feedback was provided
to the sponsor and the date(s) that it occurred. Copies of all review
memoranda, meeting minutes, or letters must be included in the pre-
IDE before it is returned to the DMC.

Finally, when a formal IDE application is received, the number of any
associated pre-IDE should be noted in the comment section of the IDE
tracking sheet. This will allow the pre-original submission to be

linked to the original IDE application and should facilitate review
of the new submission.


/s/

Philip J. Phillips


Updated 5/26/1999

_____

CDRH Home Page | CDRH A-Z Index | Contact CDRH | Accessibility | Disclaimer
FDA Home Page | Search FDA Site | FDA A-Z Index | Contact FDA | HHS Home Page

Center for Devices and Radiological Health / CDRH